Kelvin C. JOHNSON, Appellant

v.

The STATE of Texas, Appellee.

No. 14–04–00718–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 17, 2006.

Discretionary Review Refused
May 24, 2006.

Randy McDonald, Houston, for appellants.

Jessica Akins Mcdonald, Houston, for State.

Panel consists of Chief Justice HEDGES and Justices YATES and ANDERSON.

## OPINION

ADELE HEDGES, Chief Justice.

Appellant Kelvin C. Johnson appeals his conviction for aggregated theft of more than twenty-thousand dollars and less than one-hundred-thousand dollars. After finding appellant guilty, a jury assessed punishment at twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a $10,000 fine. In three points of error, appellant argues that (1) the evidence is legally and factually insufficient to support his conviction; and (2) the trial court erred by allowing appellant to represent himself. We affirm.

### *Background*

Between January 2003 and October 2003, appellant met with seven different attorneys to discuss a potential personal injury claim.[1] Using several aliases, appellant claimed that he had been injured in an offshore accident while working for Diamond Drilling Company ("Diamond"). Specifically, appellant told the attorneys that he and his co-worker, John Dubois,[2] had been unloading pipes when a cable on the crane broke, causing the heavy pipes to fall on top of them.

Appellant, who frequently limped and carried a cane when he met with the attorneys, claimed that he had been knocked unconscious and that he had injured his knee, leg, and back. Appellant said that he had undergone knee surgery at University of South Alabama Hospital in Mobile and showed some attorneys his scar. Appellant claimed that Dubois had been transported to Louisiana, where he remained in a coma. Appellant then informed the complainants that orthopedic surgeon Dr. Alan Criswell was going to operate on appellant's back at Hermann Hospital in Houston.[3] Appellant also told most of the complainants that Dubois' wife Mary wished to be represented by the same attorney as appellant.

Additionally, appellant claimed that Diamond had offered to settle and that until recently, the company had been paying his family's living expenses. However, when he met with the complainants, appellant lamented that he could no longer pay his rent and that the landlord was threatening to evict him, his wife, and their four small children.[4]

Believing appellant's case to be legitimate, the attorneys agreed to represent appellant pursuant to a contingency fee agreement. After appellant provided one

---

1. These attorneys were complainants Bill Edwards, Larry Boyd, D'Juana Parks, Gerry Dunne, J.P. Jay Hughes, James W. Nobles, Jr., and R. Gary Stephens. Complainant Robert Zeither owned the funding service that Dunne used to advance money to appellant. Complainant Charlie Johnson worked as an investigator for Edwards.

2. In one account, the co-worker's name was Chris Hamilton.

3. In one account, the surgeon's name was Dr. Wallace, and in another, it was Dr. Blackwell.

4. In two accounts, appellant claimed that his wife's name was Rosalyn; however, most of the time he used the name Vanessa. Additionally, appellant usually claimed that the youngest child was a seven-and-a-half or eight-and-a-half week-old baby.

of several Beaumont addresses and what appeared to be valid proof of identification, the attorneys advanced either checks or cash to cover appellant's various expenses. Appellant disappeared immediately after receiving the money. Shortly thereafter, the attorneys discovered that appellant had never worked for Diamond, that he had never been a patient at either the University of South Alabama Hospital or Hermann Hospital, and that the home address he had provided did not exist.

Police eventually arrested appellant after organizing a "sting" operation with complainants Edwards and Johnson. Appellant had discussed his case with attorney Edwards and believed that Edwards was going to advance him $3,000 in cash. When appellant met with Johnson, a private investigator hired by Edwards, Johnson handed appellant an envelope that contained a check made out to Edwards. Police arrested appellant as soon as he took possession of the check.

### Pretrial Proceedings

Appellant's case came before the grand jury on Nov. 24, 2003. Alleging aggregate theft by deception, the indictment stated, in relevant part, that appellant

> heretofore on or about various dates between May 21, 2003 and October 13, 2003, did then and there unlawfully, acquire and otherwise control over [sic] property, other than real property namely, money and one check, owned by Bill Edwards [sic] and/or Charlie Johnson, and/or Larry Boyd, and/or D'Juana Parks, and/or Gerry Dunne, and/or Robert Zeither, and/or J.P. Jay Hughes, and/or James W. Nobles, Jr., and/or R. Gary Stephens, hereafter styled the complainants, pursuant to one scheme and continuing course of conduct, and in an aggregate amount and value of more

> than twenty thousand dollars but less than one hundred thousand dollars....

For enhancement purposes, the indictment also alleged that appellant had one prior conviction for felony theft.

About a month before trial, appellant complained that he could not communicate with his attorney, Cedrick Muhammed. Asserting that he wished to represent himself, appellant acknowledged that he would not "get any special breaks." In response to the court's initial questions about his education, appellant stated that he was forty-one years old and had completed school through the ninth grade, although he was "well-equipped like a person who graduated." Appellant answered affirmatively when the court asked whether appellant understood the charges against him and the possible punishment ranges; when the court asked him to elaborate, he stated: "There are three cases, each are [sic] third degree felonies are [sic] enhanced by one prior true felony which makes the punishment range two years to twenty years in the punishment and a ten thousand dollar fine." When appellant expressed uncertainty about the punishment range regarding the last offense, the district attorney retrieved the file, which included the most recent cause number for the third case and a copy of the indictment. Later, appellant also stated that he knew he would be required to serve the punishment assessed by the jury if his conviction were upheld on appeal.

When the court asked about the extent of appellant's "knowledge of specific rules of criminal cases and what things you will have to do to represent yourself," appellant responded: "I have to know when to object what questions to be asked and at my trial what motions to be filed. To get rulings on my motion [sic]. Ask questions to the witness that's relevant to this criminal case." Appellant also stated that he

was familiar with the Rules of Evidence and the Rules of Criminal Procedure and acknowledged that he needed to comply with them at trial. When the court asked how appellant had become familiar with those rules, appellant replied that he had begun to study them about four years earlier. Appellant further explained that he read "the Texas law books" and "a lot of federal government books," particularly "the Court of Criminal Procedure book." Appellant also revealed that he had represented himself in a post-conviction writ and in a theft charge that was dismissed before trial.

When asked about the nature of voir dire, appellant explained that there would be about sixty people in the jury pool, that he and the district attorney each would have ten strikes, and that "me and him negotiate on what we see whoever we see that would benefit me or whoever benefits him." In response, the court informed appellant that while each side would have ten strikes, no negotiation would occur. Appellant also admitted that he did not know the difference between a peremptory challenge and a challenge for cause, and the court did not offer an explanation.

Aware that his trial was less than a month away, appellant had requested additional time to conduct legal research. The court granted this motion but advised that "even with all the time in the law library that you want I don't think you'll be ready to try a case in felony court." Appellant responded that he would indeed be ready and agreed with the court's statement that his conduct at trial "would be of critical importance to the outcome of [his] case." Appellant also stated that he understood that conducting his defense required more than simply telling the jury his side of the story. Appellant also appeared to comprehend the court's warning that the jury would not know about certain details of the

case unless appellant abided by the evidentiary rules.

Toward the end of the hearing, appellant reiterated that although he had not consulted with Muhammed about his case or arranged for any witnesses to appear on his behalf, he did not want Muhammed to represent him. Appellant stated that he was aware that he would be representing himself throughout the whole trial and acknowledged that the district attorney was a licensed, experienced attorney. Appellant also stated that he had never been found insane or incompetent and had never been treated for a mental illness; he also responded affirmatively when the court asked whether he had the "mental capacity to freely and voluntarily waive [his] right to representation by Mr. Muhammed and represent [himself] at trial." Finally, at the end of the hearing, appellant responded affirmatively when the court asked: "Do you freely and voluntarily waive your right to have Mr. Mohammed [sic] represent you in trial of these cases and telling [sic] this court that you still wish to represent yourself in trial of these cases?" Although the trial court appointed Muhammed as standby counsel, appellant did not request his assistance at trial.

### Trial Proceedings

Seven complainants testified against appellant at trial. First, Mississippi attorney James Nobles testified that he had received a referral about a potential client named Larry Ray Brown, who turned out to be appellant. Nobles met appellant at a hotel near Hobby Airport in Houston on January 10, 2003. As proof of identification, appellant showed Nobles a photo identification card from Mississippi and provided Nobles with his social security number and a Beaumont address.

Appellant told Nobles that he had been injured in an accident in April or May of 2002 while working for Diamond Drilling Company. Appellant stated that he had been working aboard an oil rig called the Ocean Tower, which was located near Petit Bois Island. Drawing a diagram, appellant explained that he and his coworker Chris Hamilton had been unloading pipes when a crane malfunctioned and dumped the pipes on top of them. Appellant, who had been limping, claimed that he had been knocked unconscious and had undergone two knee surgeries after the accident; he also claimed that Dr. Wallace at Hermann Hospital was going to perform back surgery on him. Appellant stated that Hamilton, who was in Louisiana, was in a vegetative state because the pipes had struck him in the head. Appellant offered to ask Hamilton's wife if she also needed legal representation.

Appellant told Nobles that Diamond wanted to settle the case for $375,000. After Nobles agreed to represent him, appellant further explained that Diamond had reneged on its promise to pay his family's rent, and that he and his wife Vanessa were struggling to care for their children, including a sick baby who was only a few weeks old. Appellant said that his landlord's name was Randy Jackson; when Nobles spoke with Jackson over the phone, the purported landlord confirmed that appellant owed him $3,400.

Nobles gave appellant a one-hundred-dollar bill and also wired $4,000 by Western Union. Appellant notified Nobles when he had received the money. When Nobles called Hermann Hospital several days later for an update on appellant's surgery, he learned that no one named Dr. Wallace worked there. Nobles promptly sent a letter to the Beaumont address that appellant had provided, but it returned to him marked as "no such address."

On cross-examination, Nobles acknowledged that although he had filed an official complaint, he never swore in an affidavit that appellant had stolen from him. Nobles also admitted that while his credit card showed a money transfer by Western Union, it did not show that appellant was the person who received the money. Appellant also tried to establish that the claim against Diamond was frivolous, and that under the terms of the fee agreement, appellant would not owe Nobles any money if Nobles failed to win damages on a frivolous claim.

Next, Mississippi attorney Jay Hughes testified that he met appellant, who was using the name Randy Lynn Jackson, at Hobby Airport on May 21, 2003. Appellant told Hughes that he had been working for Diamond Drilling Company on an oil rig called the Ocean Nugget. Appellant claimed that he had been injured in an accident that occurred near Dauphin Island on September 28, 2002. Sketching a diagram, appellant explained that he and his coworker John Charles Dubois had been unloading pipes in preparation for an inspection by OSHA (Occupational Health and Safety Administration) when a cable on the crane snapped and dropped the load of pipes onto them. Another worker, Chris Hamilton, witnessed the accident.

Appellant stated that he had been in a coma for twenty hours and had injured his left knee, his right leg and ankle, and several vertebrae. According to Hughes, appellant appeared to exhibit symptoms consistent with those injuries, including pain radiating down his left leg. Appellant told Hughes that he had spent thirteen days in the University of South Alabama Hospital undergoing reconstructive surgery; additionally, Dr. Criswell was scheduled to operate on appellant's back at Hermann Hospital the very next day. According to appellant, Dubois suffered a

cracked skull and had been in a coma in a Louisiana hospital for six months; his wife Mary wanted appellant to find an attorney to represent her as well. Appellant claimed that his wife Vanessa possessed detailed medical records related to the claims; however, since Vanessa had stayed at home with a sick child, appellant promised to deliver the records to Hughes the next day.

Appellant also told Hughes that Diamond had offered to settle for $600,000. Diamond had also provided appellant's family with a rental house in Beaumont, where he lived with Vanessa and their four children, including a seven-to-eight-week-old baby. However, Diamond had stopped paying the rent, and appellant needed roughly $5,000 for rent and utilities. When Hughes spoke with appellant's landlord about the arrearage, the landlord threatened to evict appellant's family immediately. Hughes then gave appellant $5,000 in cash because the landlord would not accept checks.[5] After appellant failed to appear for surgery the next day, Hughes telephoned him and the purported landlord, but to no avail.

On cross-examination, Hughes testified that he had contacted the Houston office of the FBI as well as the district attorney's office. He also acknowledged that the meeting had not been recorded and that a notary had not been present. Appellant attempted to establish that Hughes had consented to giving him the money, that appellant had not threatened Hughes physically, and that Hughes had never filed an official complaint. Appellant also tried to establish that the contingency fee agreement provided that Hughes would cover all expenses related to the case, and

that if Hughes did not win money after a trial, appellant would owe him nothing.

The same day that he met with Hughes, appellant also met with Beaumont attorney D'Juana Parks at a hotel in Houston. Still using the name Randy Lynn Jackson, appellant told Parks that although he lived in Beaumont, he was currently in Houston because his child was in a hospital there. Appellant also said that his wife's name was Vanessa and that they had four children, including a seven-and-a-half-week-old baby.

Limping and carrying a cane, appellant reiterated that he had been injured on the Ocean Nugget while working for Diamond. The accident occurred near Dauphin Island on September 28, 2002. According to appellant, toolpusher John Henison had asked appellant and coworker John Dubois to unload pipes from a supply barge because he expected a visit from OSHA. A man named Mr. Bradford, who worked for Exxon, was also present. Parks testified that appellant drew a diagram and explained that the accident had occurred because Diamond's crane was broken, and the men were forced to use an Exxon crane that lacked the proper safety equipment.

Appellant told Parks that the load of pipes fell, striking appellant and hitting Dubois in the head. Appellant claimed that he had injured his knee, ankle, and back, and had been unconscious for twenty hours. Appellant told Parks that he had already had reconstructive surgery on his left knee at the University of South Alabama Hospital, and that Dr. Alan Criswell was going to operate on appellant's back the next day at Hermann Medical Center. Appellant also stated that Diamond had offered to settle the case for $400,000 if

---

**5.** Hughes testified that appellant had asked him to wire money to him before they had met in person; however, Hughes informed appellant that he did not advance money to people unless an attorney/client relationship existed between them.

appellant would testify that Dubois had been at fault in the accident.

Parks testified that she agreed to represent appellant and that he signed a contract with her firm, Provost & Umphrey. Prior to their meeting, she and appellant had discussed his financial situation; after appellant signed the representation contract, Parks gave him a $5,000 check from her firm. Parks testified that appellant cashed the check the next morning and that the check was marked with the Arkansas identification number and date of birth that appellant had provided.

The next day, Parks called the hospital to check on appellant and learned that there was no registered patient named Randy Lynn Jackson. Parks testified that she then called appellant's cell phone, and he told her that the surgery was scheduled for the following day. Parks then contacted Dr. Criswell, a well-known orthopedic surgeon, who told her that he did not have a patient named Randy Lynn Jackson. Parks also attempted to contact appellant's landlord, Michael Henison; Parks testified that the person who answered the phone sounded nervous, and that she was unable to reach Henison.

On cross-examination, Parks testified that appellant had cashed the check before she could stop payment on it. She also acknowledged that appellant did not physically take the check from her and that she had not signed an affidavit under oath. Appellant also tried to establish that because the contract contained an arbitration clause, the resolution of any differences should be a civil rather than a criminal matter. Appellant also insinuated that Parks was responsible for her own financial loss because she should have investigated the validity of the claim more thoroughly before giving the check to appellant.

Another Texas attorney, R. Gary Stephens, testified that he met appellant, who was using the name Randy Jackson, on June 12, 2003. At the meeting, appellant presented a photo identification from Arkansas, although a bleach spot obscured most of the picture. Appellant also gave Stephens a Beaumont address and his driver's license number, but he did not have the license with him.

Appellant told Stephens that he had been injured in an offshore accident on September 28, 2002 while working for Diamond. Stephens testified that appellant drew a diagram and explained that the accident had occurred when he and co-worker John Dubois were aboard the Ocean Nugget, unloading pipes with an Exxon crane. According to appellant, Mr. Bradford, the Exxon "company man," wanted the work completed before OSHA arrived the next day. Appellant told Stephens that the pipes fell, knocking appellant unconscious and injuring his knee and back; appellant also mentioned that another worker, Chris Hamilton, had witnessed the accident. Appellant stated that Dubois, whose injuries were more severe, was comatose in a hospital in Louisiana. Showing Stephens his scar, appellant explained that he had had surgery on his knee, leg, and ankle, and had stayed in the University of South Alabama Hospital for fourteen days. Appellant also stated that he had previously consulted with Dr. Blackwell and that Dr. Criswell was going to perform additional surgery on his back.

Stephens testified that appellant revealed his financial troubles after signing the contingency fee contract. Appellant told Stephens that he and his wife Vanessa had four children, and that their landlord was named Michael Henderson. According to Stephens, appellant requested $7,500; Stephens agreed to advance $6,000 and told appellant that he would advance

the remaining $1,500 after further investigation of the case.

Shortly thereafter, Stephens contacted the hospital where Vanessa allegedly worked and discovered that there was no such employee. Likewise, when Stephens contacted Diamond, he learned that appellant had never worked there. Stephens testified that he tried to stop payment on the $6,000 check, but appellant had already cashed it. On cross-examination, appellant again tried to establish that under the contingency fee agreement, if the attorney did not win money for appellant at a trial, then appellant would owe nothing.

Missouri attorney Gerry Dunne testified that he met appellant on August 10, 2003. At the meeting, appellant showed Dunne a photo identification card bearing the name Scott Lamb; a woman claiming to be his wife Rosalyn accompanied appellant to the meeting. Limping and using a cane, appellant stated that he had been injured on the Ocean Nugget, an oil rig maintained by Exxon, while he was working for Diamond. Appellant told Dunne that the accident happened on October 27, 2002.

Using two diagrams, appellant illustrated the proper and improper methods of handling supplies and gave his standard account of how the accident had occurred. Showing Dunne his scar, appellant stated that he had already had surgery on his leg and knee and that Dr. Blackwell was going to operate on his back in a week. Appellant mentioned that his friend John David Dubois also had been injured; appellant told Dunne that Diamond had offered him a $150,000 settlement in exchange for testimony that Dubois had been at fault. According to Dunne, appellant also said that Dubois' wife Mary needed legal representation.

Dunne testified that after he decided to represent appellant, appellant and his female companion signed the contract as Scott and Rosalyn Lamb. Claiming that he had not been paid since the accident, appellant told Dunne that he needed $10,000 in cash. After informing appellant that Missouri law did not allow attorneys to advance funds directly to clients, Dunne referred appellant to Injury Case Funding, a company owned by complainant Robert Zeither. The company agreed to advance $6,000, and appellant notified Dunne when he had received cash from Western Union.[6]

Dunne further testified that around the same time, Mary Dubois called his office from Lafayette, Louisiana and asked Dunne to represent her. Dunne mailed her the relevant paperwork, but it came back as undelivered. Similarly, a letter that Dunne had sent to appellant's Beaumont address was returned because no such address existed. On cross-examination, appellant tried to establish that the case should be tried in civil court.

Houston attorney Larry Boyd testified that he met appellant, who was using the name Randy Lynn Jackson, at a hotel on June 25, 2003. Appellant was limping and using a cane, and was accompanied by his wife Vanessa. Appellant showed Boyd an Arkansas driver's licence with a photograph and said that he lived on Magnolia Street in Beaumont.

Appellant told Boyd that he and a co-worker, whose last name was Dubois, had been injured on a rig called the Ocean Nugget when a load of pipe fell on them. The accident occurred on September 28, 2002; witnesses included toolpusher John Hinson, roustabout Chris Hamilton, and Exxon company man Mr. Bradford. Appellant claimed that he had been knocked

---

6. Appellant actually received $5,704.76 because fees were deducted from the $6,000.

unconscious and had stayed at the University of South Alabama Hospital for sixteen days. Appellant told Boyd that he had already had some surgery but needed more operations on his knee, leg, ankle, and back. Appellant said that he had previously consulted with Dr. Blackwell and that Dr. Criswell was going to perform the additional procedures. Appellant also told Boyd that Dubois was in a coma in Louisiana and that his wife Mary wanted appellant's attorney to represent her as well. Appellant also mentioned that Diamond had offered to settle for $400,000.

Boyd testified that after appellant and Vanessa had signed the power of attorney, appellant informed him that they were behind in their rent and were going to be evicted. Appellant requested $5,000 to care for their four children, including an eight-and-a-half-week-old baby, and to cover his medical expenses. Boyd gave appellant a $5,500 check, which appellant cashed the very same day. The check was marked with the same date of birth and Arkansas identification number as appellant had used previously.

Boyd testified that he tried unsuccessfully to stop payment on the check and to contact appellant on his pager after learning that the address appellant had provided did not exist. Boyd also learned that the social security number appellant had provided belonged to someone else.

On cross-examination, appellant again argued that under the contract, he was not obligated to pay Boyd if Boyd did not win any money at a trial. Appellant also suggested that Boyd was at fault because he had failed to investigate appellant's case thoroughly before advancing the money.

Texas attorney Bill Edwards testified that he first spoke with appellant, who was using the name Scott Lamb, on October 6, 2003. Over the phone, appellant relayed the story about the accident aboard the Ocean Nugget, which he claimed had occurred on November 28, 2003 near Dauphin Island. Appellant informed Edwards that Dr. Criswell was treating appellant's injured knee and back and said that Dubois was still in a coma in Louisiana. Appellant also told Edwards that Dubois' wife, Mary, planned to hire the same attorney as appellant, and that Diamond had offered him $450,000 to settle the case.

After an unsuccessful attempt to meet with appellant, Edwards became suspicious and began to investigate appellant's story. When a representative from Diamond told Edwards that several lawyers had called Diamond about the alleged accident, Edwards contacted the authorities.

Wanting to catch appellant in the act, Edwards agreed to represent him. Appellant and his wife signed the representation contract as Scott and Rosalyn Lamb. Appellant also provided Edwards with copies of the purported settlement offer from Diamond, which bore the signature of a man who had already retired from the company, as well as copies of a social security card and other forms of identification bearing the name "Scott Lamb." Edwards testified that appellant also produced copies of medical bills and a check stub for his living expenses; however, the bills were dated before November 28, 2003, the date on which appellant claimed the accident had occurred.

Edwards testified that after appellant requested $3,000 in cash to be wired to a store in Harris County, Edwards and the authorities organized a "sting" operation. Edwards arranged for investigator Charlie Johnson to meet appellant at Hobby Airport on October 13, 2003, ostensibly to give appellant the money in person. When appellant arrived, limping and carrying a cane, he reiterated what he had already told Edwards and said that his back sur-

gery was scheduled for the next day at Hermann Hospital. At that point, Johnson agreed to give appellant the money; however, instead of cash, Johnson handed appellant an envelope containing a $3,000 check that Edwards had made out to himself. Johnson testified that appellant was displeased about receiving a check, so Johnson gave him forty dollars in cash. When appellant accepted the envelope, police promptly arrested him.

On cross-examination, Edwards acknowledged that he never signed an affidavit regarding the criminal case against appellant. Edwards also acknowledged that the check appellant had accepted was written to William R. Edwards. Consequently, appellant argued that no theft had occurred because he had taken a mere piece of paper and Edwards had not lost any money. On cross-examination, Johnson stated that appellant had not stolen anything from him.

Officer Gordon Michael Garrett of the Houston Police Department testified that he filed the charge against appellant and that appellant had stolen a total of $34,500. Garrett also testified that when they arrested appellant, officers found a fake social security card bearing the name "Scott Mark Lamb." On cross-examination, Garrett testified that the number on the card actually belonged to Scott Anthony Lamb.

The true Scott Lamb also testified at trial. Lamb testified that the number on appellant's fake card was indeed Lamb's social security number, that he had never given appellant permission to use his social security number, and that he had never used the name Scott Mark Lamb. On cross-examination, Lamb admitted that appellant did not steal cash from him, but he stated that appellant had stolen his credit. On cross-examination, appellant also tried to establish that the fake social security card was simply a novelty card that he had bought in Houston.

William McCown, Diamond's director of personnel services, testified that the company had no employment records for Kelvin Clandus Johnson or any of appellant's aliases. Similarly, Theresa Ancelett, the director of administrative services for Memorial Hermann Healthcare, testified that Scott M. Lamb had never been a patient at any of the Hermann hospitals. Ancelett also testified that notable discrepancies existed between the documents that appellant had given to Edwards and the documents the hospitals use; for example, appellant's records displayed a different size font, listed an incorrect area code and office hours, and improperly included information about medical procedures on the bill. Finally, according to the affidavits of the custodians of business records for the University of South Alabama, Dr. Meyer, Dr. Blackwell, and Dr. Criswell, appellant had never been one of their patients.

After the State rested, appellant called prosecutor Harry Lawrence, who was trying the case, as his only defense witness. Lawrence acknowledged that he had not witnessed the thefts firsthand and repeatedly explained the functions of indictments and grand juries. Appellant again argued that the matter should be pursued in civil, not criminal, court.

The trial court denied appellant's motion for an instructed verdict of not guilty. The jury convicted appellant and sentenced him to twenty years' confinement and a $10,000 fine. On appeal, appellant argues that (1) the evidence is legally and factually insufficient to support his conviction and (2) the trial court erred by allowing him to represent himself.

### Standards of Review: Legal and Factual Sufficiency

In evaluating the legal sufficiency of the evidence, we must view the evi-

dence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vasquez v. State,* 67 S.W.3d 229, 236 (Tex.Crim.App.2002). This standard of review applies to cases involving both direct and circumstantial evidence. *King v. State,* 895 S.W.2d 701, 703 (Tex.Crim.App.1995). Although we consider all evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the jury. *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony, and it is the exclusive province of the jury to reconcile conflicts in the evidence. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App.2000).

■ In a factual sufficiency review, the reviewing court must view all the evidence in a neutral light and determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State,* 144 S.W.3d 477, 484 (Tex.Crim.App.2004). Evidence is factually insufficient if, when considered by itself, the evidence supporting the verdict is too weak to support a finding of guilt beyond a reasonable doubt and thus renders the conviction clearly wrong and manifestly unjust. *Id.* at 485; *Vasquez,* 67 S.W.3d at 236 (Tex.Crim.App.2002). Alternatively, evidence is factually insufficient if the evidence contrary to the verdict is strong enough that the beyond-a-reasonable-doubt standard cannot be met, even if evidence supporting guilt outweighs the evidence to the contrary. *Zuniga,* 144 S.W.3d at 484. The reviewing court may not substitute its own judgment for that of the jury and may not intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony. *Vasquez,* 67 S.W.3d at 236.

### *Definition of Aggregated Theft*

■ The jury found appellant guilty of aggregated theft of more than twenty-thousand dollars and less than one-hundred-thousand dollars. Theft is defined as the appropriation of property, including money, with the intent to deprive the owner of the property and without the owner's effective consent. TEX. PEN.CODE ANN. § 31.03(a), (b)(1) (Vernon Supp.2005). Consent is not effective if induced by deception. TEX. PEN.CODE ANN. § 31.01(3)(A) (Vernon Supp.2005); *Ellis v. State,* 877 S.W.2d 380, 382 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd). Deception can be creating a false impression or promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed. TEX. PEN.CODE ANN. § 31.01(1)(A), (E).

When a defendant has committed multiple thefts over a period of time, the thefts may be considered as one crime if they were committed pursuant to one scheme or continuing course of conduct. TEX. PEN. CODE ANN. § 31.09 (Vernon 2003). Section 31.09 provides: "When amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense."

Appellant argues that the evidence is legally and factually insufficient because (1) it fails to prove the existence of one scheme and continuing course of conduct; and (2) it fails to prove that appellant stole money and one check, with a combined total of at least $20,000, from one particular complainant. We disagree.

### "One Scheme and Continuing Course of Conduct"

■ While appellant concedes that his interaction with each complainant "was similar in nature to achieve the objective goal of loan or advance of money in order to take and pursue a legal litigation," he argues that the evidence is legally and factually insufficient to establish that his acts constituted one scheme or continuing course of conduct. Accusing the State of "overstepp[ing] the logic of the law in an effort to punish appellant beyond the range possible for the crimes committed," appellant contends that the similarities of the offenses fail to establish that "any of these complainants are connected to each other in a continuing scheme." Although appellant cites no authority for this argument, we will address this point briefly.

■ When interpreting a statute, a court must construe words and phrases according to the rules of grammar and common usage unless they have acquired a technical or particular meaning. *Ex Parte Ruthart*, 980 S.W.2d 469, 472 (Tex.Crim. App.1998). In drafting section 31.09, the legislature did not attach a technical or particular meaning to "scheme" or "continuing course of conduct"; thus, we must give the words their common meaning. *See* TEX. PEN.CODE ANN. § 31.01 (Vernon 2005); § 31.09 (Vernon 2003); *Sendejo v. State*, 676 S.W.2d 454, 456 (Tex.App.-Fort Worth 1984, no writ.)

We find that a rational juror could have found that appellant's acts constituted one scheme or continuing course of conduct. Over a ten-month period, appellant told all seven attorneys that he used to work for Diamond and that he and a coworker had been injured while unloading pipes on an oil rig, usually called the Ocean Nugget. Appellant's comatose coworker usually was named John Dubois, and appellant frequently claimed that Dubois's wife Mary also needed representation. In most instances, appellant claimed that Diamond had offered a settlement. Appellant also consistently stated that he had injured his knee, leg, and back, and that he needed further surgery; appellant typically claimed that Dr. Criswell was going to perform the operation. Furthermore, appellant repeatedly lamented that he needed money to care for his wife, who usually was named Vanessa, and their four children. Appellant always requested large sums of money from the complainants and disappeared after receiving the money. Appellant used the same alias with several complainants, and he routinely mentioned certain other characters in his various accounts, including Michael Henison/Henderson, Mr. Bradley, Dr. Blackwell, and Chris Hamilton. Appellant presented no evidence at trial that controverted these facts.

Viewing the evidence in the light most favorable to the verdict and in a neutral light, we find it to be legally and factually sufficient to establish that appellant committed the thefts pursuant to one scheme or continuing course of conduct. *See Ellis*, 877 S.W.2d at 382–83 (finding evidence sufficient to support conviction for aggregated theft when appellant, who operated a loan company purporting to help people with poor credit to buy cars, took down payments from eight complainants and failed to provide complainants with cars or refunds); *Noor v. State*, No. 01–02–01148–CR, 2004 WL 744575, at *3–4 (Tex.App.-Houston [1st Dist.] April 8, 2004, no pet.) (not designated for publication) (holding that appellant's acts constituted a continuing course of conduct when appellant offered to sell discounted merchandise to four complainants, explained that he had acquired the merchandise from a grocery store, requested cash prior to the exchange, met the complainants near a hotel

or shopping center, and entered the hotel or shopping center under the guise of retrieving the goods but never returned).

### *"Money and One Check"*

■ Secondly, appellant argues that the evidence is legally and factually insufficient because the State failed to prove that appellant stole "money and one check," whose combined total was at least $20,000, from one particular complainant. According to appellant, the State was required to prove this combination because it used the conjunctive term "and" to connect the words "money" and "one check" in the indictment. Similarly, appellant argues that the jury charge, which used the disjunctive term "or" between the complainants' names, also required the State to prove that appellant stole "money and one check," whose combined total is at least $20,000, from one particular complainant, rather than from the complainants collectively.[7] Although appellant again cites no authority for his arguments, we will address these points briefly as well.

■ We find that the State was not required to prove that appellant stole "money and one check," whose combined total is at least $20,000, from only one complainant. In a theft case, the allegedly stolen property must be generally described in the indictment and conforming evidence must be adduced. *Lehman v. State,* 792 S.W.2d 82, 84 (Tex.Crim.App. 1990). However, the State need not show that the accused stole *every* piece of property described in the indictment in order to secure a valid conviction. *Id.* (emphasis in original). As the *Lehman* court explained:

[The State] must prove theft of property described in the indictment in an amount sufficient to satisfy the jurisdictional requirement of its pleading. According to this theory, if a defendant is charged with stealing "A, B, and C, widgets of an aggregate value greater than $750.00 but less than $20,000.00," the State need only prove that defendant stole widgets worth between $750.00 and $20,000.00 from among widgets A, B, and C.

The *Lehman* court also remarked that once a defendant "has been given proper notice that he must prepare to defend himself against a charge that he has stolen a certain 'bundle' of property, there is no reason that he should be acquitted if the evidence shows him guilty of stealing enough of the 'bundle' to make him guilty of the offense charged." *Id.* Furthermore, it is proper for the State to plead alternative "manner or means" in the conjunctive when proof of any one "manner or means" will support a guilty verdict. *Id.; see also State v. Weaver,* 945 S.W.2d 334, 335 (Tex.App.-Houston [1st Dist.] 1997) (holding that the State is not required to prove each individual theft that makes up an aggregate theft allegation as long is it demonstrates that enough of the property from the indictment was stolen to satisfy the aggregate value allegation), *aff'd,* 982 S.W.2d 892 (Tex.Crim.App.1998); *Harrell v. State,* 834 S.W.2d 540, 543 (Tex.App.-Houston [14th Dist.] 1992, pet. ref'd) (holding that when the indictment in an aggregated theft case alleged eighty-three checks made payable to defendant, the State needed to prove only an aggregated value, not each individual theft). Finally, it is proper for the jury to be charged in the disjunctive when the indictment uses

---

7. Appellant insinuates that the State's use of the disjunctive and its failure to object to the jury charge elevated its burden of proof. However, appellant neither cites authority for this assertion nor explains his reasoning. Therefore, we will not consider this argument. *See* TEX.R.APP. P. 38.1(h).

the conjunctive to allege different methods of committing the offense. *Kitchens v. State,* 823 S.W.2d 256, 258 (Tex.Crim.App. 1991).

■ Accordingly, we find that the phrasing of the indictment and the jury instructions did not require the State to prove that appellant stole "money and one check," whose combined total was at least $20,000, from only one complainant. We also find that a rational jury could have found that appellant stole "a bundle" of at least $20,000 from the complainants collectively. The complainants' testimony revealed that appellant took $4,000 from Nobles, $5,000 from Hughes, $5,000 from Parks, $6,000 from Stephens, $6,000 from Dunne, $5,500 from Boyd, and $3,000 from Edwards; Detective Garrett also testified that the total amount stolen was $34,500. There is no evidence that appellant did not take the money; at trial, appellant simply argued that the case should be tried in civil, not criminal court, and he also tried to diminish the witnesses' credibility by proving that they had not signed affidavits. Viewing the evidence in the light most favorable to the verdict and in a neutral light, we find it to be legally and factually sufficient to support appellant's conviction for aggregated theft greater than twenty-thousand dollars and less than one-hundred-thousand dollars. Therefore, we overrule appellant's first and second points of error.

### *Waiver of Right to Counsel*

■ In his third point of error, appellant argues that the court erred by allowing appellant to represent himself at trial. Essentially, appellant argues that his waiver of his right to counsel was not knowing and intelligent because the trial court failed to conduct a proper *Faretta* hearing.[8] We disagree.

■ A defendant has a constitutional right to proceed without the assistance of counsel when he or she voluntarily and intelligently elects to do so. *Faretta v. California,* 422 U.S. 806, 818–20, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The decision to proceed *pro se* is made knowingly and intelligently if it is made with a full understanding of the right to counsel, which is being abandoned, as well as the dangers and disadvantages of self-representation. *Id.* at 834–36, 95 S.Ct. 2525. This means that the trial court must thoroughly admonish the defendant, so that the record reflects that the defendant "knows what he is doing and his choice is made with eyes open." *Id.* There is no specific formula that establishes a knowing and intelligent waiver; however, a trial judge must actively assess a defendant's waiver of counsel. *Blankenship v. State,* 673 S.W.2d 578, 583

---

**8.** Appellant asks the court to establish "a 'bright line' of questions that should be asked of persons that want to represent themselves, pro se" in order to insure that they can competently represent themselves. We decline to do so, as the law in this area is well-established. Further, appellant's argument that pro se defendants should be questioned to determine whether they can competently represent themselves is misplaced. The Sixth Amendment guarantee of the right to assistance of counsel includes the right to represent oneself. U.S. CONST. amend. VI; *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Thus, the determination to be made by the trial judge is whether the defendant is competent to make the decision to waive his right to counsel, not whether he can competently represent himself in a legal proceeding. *Faretta,* 422 U.S. at 835–36, 95 S.Ct. 2525. To hold otherwise would, in effect, deny the defendant his right to waive counsel.

Appellant also complains that he did not have adequate notice of the charges against him because he never saw a motion to quash the indictment. However, the record indicates that appellant received a copy of the indictment itself at the *Faretta* hearing.

(Tex.Crim.App.1984). Furthermore, courts must indulge every reasonable presumption against the validity of such waiver. *Jordan v. State,* 571 S.W.2d 883, 884 (Tex.Crim.App.1978).

We find that appellant knowingly and intelligently waived his right to counsel. The trial court thoroughly admonished appellant, and appellant confirmed that he understood the admonishments. In *Collier v. State,* the Court of Criminal Appeals examined the admonishments given by the trial court and held that the defendant knowingly and intelligently waived his right to counsel. 959 S.W.2d 621, 626 (Tex.Crim.App.1997). In *Collier,* the trial court explained that the defendant, who had earned his GED (General Educational Development), was required to follow the rules of evidence and procedure without any special consideration and warned that as a result, the defendant might be disadvantaged at trial and in any consequent appeal. *Id.* The trial court also explained the nature of the charges against Collier, the fact that lesser included offenses might be submitted to the jury, and the possible range of punishment. *Id.* Finally, the court repeatedly tried to impress upon Collier "the extreme gravity of his request to proceed *pro se* and the likelihood that it was a serious mistake." *Id.*

Similarly, in the instant case, appellant answered affirmatively when the court asked whether he understood the charges against him and the possible punishment ranges. When asked to articulate them, appellant stated: "There are three cases, each are [sic] third degree felonies are [sic] enhanced by one prior true felony which makes the punishment range two years to twenty years in the punishment and a ten thousand dollar fine." When appellant expressed uncertainty about the punishment range of the last offense, the district attorney retrieved the file, which included the most recent cause number for the third case and a copy of the indictment. Additionally, appellant acknowledged that he would be required to serve the punishment assessed by the jury if his conviction were upheld on appeal.

Although appellant had not earned a GED as Collier had, he stated that he had completed school through the ninth grade and was "well-equipped like a person who graduated." Appellant also stated that he had never been found incompetent or insane, had never been treated for a mental illness, and had previously represented himself in a post-conviction writ and a theft charge that was dismissed before trial.

As in *Collier,* the court told appellant that he must abide by all the legal rules applicable to criminal cases and that he would not "get any special breaks," which appellant acknowledged. Appellant also understood that the prosecutor was a licenced, experienced attorney. When the court asked about the extent of appellant's "knowledge of specific rules of criminal cases and what things you will have to do to represent yourself," appellant responded that he must file motions, question witnesses, and occasionally make objections. When appellant demonstrated his confusion about the voir dire process, the court informed him that negotiation was not allowed.

Appellant asserted that he was familiar with the Rules of Evidence and the Rules of Criminal Procedure because he had begun to study "the Texas law books" and "a lot of federal government books" four years earlier. Appellant acknowledged that he needed to follow these rules at trial and appeared to understand that the jury would not learn certain facts if he failed to do so. Appellant also understood that conducting his defense required more than simply telling the jury his side of the story

and agreed when the court cautioned that appellant's conduct at trial "would be of critical importance to the outcome of [his] case."

Appellant stated several times that he did not want Muhammed to represent him, and he responded affirmatively when the court asked whether he had the "mental capacity to freely and voluntarily waive [his] right to representation by Mr. Muhammed and represent [himself] at trial." Appellant also responded affirmatively when the court asked: "Do you freely and voluntarily waive your right to have Mr. Mohammed [sic] represent you in trial of these cases and telling [sic] this court that you still wish to represent yourself in trial of these cases?" Additionally, even though the court granted appellant's request for more time to conduct research, it warned that "even with all the time in the law library that you want I don't think you'll be ready to try a case in felony court." The trial court ultimately appointed Muhammed as standby counsel, although appellant did not consult with him at trial.

The record reflects that the trial court thoroughly admonished appellant and that appellant understood the consequences of proceeding to trial without the assistance of counsel. Therefore, because we find that the evidence is sufficient to support a finding that appellant's waiver was knowing and intelligent, we overrule appellant's third and final point of error. *See Collier,* 959 S.W.2d 621 at 626; *Kristopher v. State,* No. 14–97–01210–CR, 2000 WL 767700, at *4 (Tex.App.-Houston [14th Dist.] June 15, 2000, pet. ref'd) (not designated for publication) (holding that appellant knowingly and intelligently waived right to counsel after trial court questioned appellant about her education, explained that appellant would be required to follow technical rules of evidence and procedure without special consideration, informed appellant of the pending charges and possible ranges of punishment, and tried to impress upon appellant that representing herself was likely a mistake). Because we find the evidence to be both legally and factually sufficient to support appellant's conviction for aggravated theft, and because we find that appellant knowingly and intelligently waived his right to counsel, we affirm the conviction.