In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-14-00330-CR**
_____

**DENISE WILNELL DIRDEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 12-01-00323 CR**

**MEMORANDUM OPINION**

The State initially charged Denise Wilnell Dirden (Denise or Appellant) with aggregate theft of money over $200,000, "from Ike Martin and/or Martin Wood Company and/or Stoneham Mill Company, the owner, . . . pursuant to one scheme or continuing course of conduct which began on January 28, 2008, and continued until on or about December 16, 2008[.]" *See* Tex. Penal Code Ann. §§ 31.03, 31.09 (West 2011 and Supp. 2015). The State amended the indictment. In the Amended Indictment, the State amended the defendant's name, the owners'

names, and added language specifying that the money came from "account number(s) 1003706 and 1047786 at First Bank of Conroe, N.A[.]" Denise pleaded "not guilty." A jury found Denise guilty "of theft, as charged in the indictment." Denise elected to have the trial court assess punishment, and the court sentenced Denise to fifty years in prison. Denise timely appealed, raising six issues. We affirm the trial court judgment as reformed to correct a clerical error.

EVIDENCE AT TRIAL

Isaac Martin III (Ike) owned two timber-related businesses: Stoneham Mill, Inc. (Stoneham Mill), a hardwood sawmill, and Martin Wood Company, Inc. (Martin Wood), a factoring company. Upon delivering timber to a sawmill (including, but not limited to, Stoneham Mill), loggers would receive a scale ticket that recorded the date of delivery, the name of the logger, and the weight of the timber. Martin Wood purchased scale tickets from loggers at a discounted rate, and by paying loggers a discounted rate for their scale tickets, Martin Wood made a four percent profit. Ike explained the Martin Wood business model at trial:

Q. . . . Do you have a lot of expenses with Martin Wood?

A. No.

Q. Any reason why Martin Wood should lose money?

A. No.

Q. Why do you laugh?

A. Because there is no way to lose money.

Q. Why do you say that?

A. Because the expenses are so -- the expenses are so low. All you're paying is basically a light bill and someone to sit there and write the checks and pay for the timber. A $1,000 a week maybe.

Q. In expenses?

A. At the most, yes.

Q. So your profit is four percent. What's the risk for you?

A. Loaning money I suppose, stealing money, loaning money. There really is no risk.

Q. Okay. There is no risk because it's just a profit business?

A. Unless you start loaning people money, there's basically no way to lose.

In addition to paying loggers on a factored basis, Martin Wood paid landowners for stumpage and advanced loggers funds for certain business expenses, both of which were to be later deducted from the amount paid to the loggers. Denise and Patricia Brown (Patricia), who also worked in the Martin Wood office, completed "settlement sheets" that were supposed to itemize the amount due to each logger, based on the quantity and type of wood delivered, and reflect deductions necessary for stumpage or for advances previously made to the logger.

Denise worked as the office manager for Ike's companies from 2002 until March or April of 2009. Her job duties included buying log tickets from loggers, paying bills, depositing money in the bank, and bookkeeping. As office manager, she also supervised two office employees: her son Trinity Howard (Trinity) and Patricia. During the relevant time period, Martin Wood utilized accounting software called QuickBooks to electronically maintain checkbook records. Denise was authorized to advance up to $1000 to loggers.

When she started working for Ike, Denise was married to Donald Ray Howard (Ray), who also worked for Ike at Stoneham Mill. Denise filed for a divorce from Ray in July of 2008 and received a decree of divorce on October 1, 2008. Denise began seeing Lawrence Dirden[1] (Lawrence) in 2008 and married Lawrence in 2010.

Ike testified that bounced checks were not "uncommon" for Martin Wood, and Ike was not concerned about the Martin Wood bounced checks because he felt they merely reflected a "cash flow problem" and a "cost of doing business." However, at some point in mid-2008, Ike noticed that the Stoneham Mill bank account also had problems with bounced checks and insufficient funds. Ike

---

[1] Lawrence Dirden was tried and convicted as a co-defendant in the same trial with Appellant. Lawrence is not a party to this appeal.

explained that, in early 2009, he asked Patricia to do an internal audit to reconcile "receivables or the wood we bought with the wood that was being paid for."

Ike explained that he had first perceived Lawrence to be a part-time logger, but later perceived him to be a full-time logger based on the value of the scale tickets Martin Wood was purchasing from Lawrence and from Lawrence's logging company, L2, Inc. (L2). The scale tickets indicated that L2 was selling large quantities of lumber to sawmills. At trial, Ike recognized Denise's handwriting on Stoneham Mill lumber tickets written to L2. Ike testified that it was not part of Denise's job to write lumber tickets on behalf of Stoneham Mill. Trinity also testified that he recognized Denise's handwriting on Stoneham Mill scale tickets issued to L2, that Denise was not supposed to be filling out any scale tickets for Stoneham Mill, and that Trinity was responsible for completing Stoneham Mill scale tickets. Erin Smith (Smith), a forensic examiner with the Montgomery County district attorney's office, testified that during this time period, L2's bank accounts did not reflect any increased payments to L2's workers despite the L2 scale tickets showing an increase in logging activity.

Ultimately, Ike approached law enforcement alleging Denise was misappropriating funds from him or his companies, and he presented certain checks to back up his claim. Ike believed the primary way Denise took money

from him was by writing checks. Ike agreed that "most of the theft in this case occurred [] in September and October[,] in the fall of 2008[.]" Due in part to "trust issues" Ike had concerning Denise, on October 24, 2008, Ike opened an account at Woodforest National Bank for Martin Wood, and he instructed Denise that she should no longer use the First Bank of Conroe account for Martin Wood. He also deleted Denise as an authorized signer on the First Bank of Conroe account for Martin Wood. Ike estimated that ultimately Martin Wood lost about seventy-five percent of its business as a result of loggers getting bounced checks.

At trial, Ike recognized numerous checks Denise had written for expenses related to the construction of Denise and Lawrence's home, and Ike testified that he did not authorize any such checks. Trinity testified that he was with Denise at Home Depot on an occasion when Denise picked up home construction items for Denise and Lawrence's home and paid for the items with a Stoneham Mill check. Patricia also testified that she was with Denise on an occasion when Denise picked up faucet fixtures and paid using a Stoneham Mill check.

The State offered a summary of fifty-five checks written on Stoneham Mill or Martin Wood First Bank of Conroe accounts that had been made payable to Trinity, totaling $55,161. Trinity testified at trial that Denise had written the checks payable to him, he cashed the checks, and he gave the cash to Denise. Ike testified

that none of the fifty-five checks written to Trinity were authorized. Leah Howard (Leah), who is married to Denise's son Dennis Howard (Dennis), also testified at trial. Leah worked at Martin Wood, and she testified that Denise also wrote checks payable to Leah, Leah would cash the checks, and Leah would take the cash to Denise.

According to Trinity, at one point in 2008, Denise was "never at the office anymore. She just hardly was ever there." Trinity told Denise he knew she was seeing someone, and that

> I didn't want to tell her who I thought it was. I wanted to wait and find out who it was. So I told her -- I said, I know. I just don't know who it is. She told me, well, it's Lawrence. And I said, Lawrence Dirden? She said, yeah, Lawrence Dirden. And she told me I couldn't tell anyone. No matter what, to not tell anyone. I asked her why. She said because Ike thinks I'm stealing money from him. If he finds out that me and Lawrence are together, he's going to think I'm stealing it for Lawrence.
>
> . . . .
>
> I asked her if she was stealing money for Lawrence. She said, no. All she did was loan Lawrence money. And I said, well, then it don't matter if y'all are together and they find out. If you've loaned him money, you are -- she was at a position at her job where she could loan money to people, you know, and get money back without having to ask for permission.

Trinity also testified that Denise and Lawrence had asked him to take the blame:

> . . . Denise and Lawrence had stated to me if I took the blame for the money that was in my name, for the checks that are in my

7

name, that I wouldn't get in trouble for them because I was a minor at the time. I was under the age. And the most I would get for was probation, and they couldn't send me to jail for it or anything.

. . . .

And then that's when we kind of had our falling out. Not right then, but afterwards I quit talking to her because I didn't want to take blame for something that I didn't do and end up going to jail or getting probation for it.

. . . .

. . . Denise was telling me that if I took the blame for the checks that were in my name that I wouldn't get in any trouble. And then that's when I told them I will get in trouble, you know, because it was still stealing. And Lawrence said, well, you was under the age at the time that it happened. Nothing can happen to you. And then that's when Denise told me all that would happen is I would get probation.

Patricia also testified that Denise would miss work because Denise was with Lawrence. According to Patricia, it was common knowledge that Denise and Lawrence were together, but Patricia also explained that she kept this secret for Denise. Ike testified that Denise was out of the office a lot, but he gave her "[l]ots of slack" because she had told him she had cancer.

Smith testified about her forensic analysis. According to Smith, phone records showed 11,811 calls or texts between Denise and Lawrence between October 2007 and June 2009. Smith's analysis indicated that Denise wrote unauthorized checks totaling $203,291 on the First Bank of Conroe accounts, and

8

Denise made overpayments to Lawrence or L2 totaling $38,506 from the First Bank of Conroe accounts. Smith concluded from her analysis that sometimes payments by Martin Wood or Stoneham Mill to L2's employees were not properly deducted from payments to Lawrence or L2, and if such deductions were not made, the result would be an overpayment to Lawrence or L2. She reported that she discovered three ways in which Lawrence or L2 was paid incorrectly: by paying at the wrong price for the lumber that was delivered, by paying for the wrong weight, or by failing to apply the proper deductions. Smith identified occasions when accounts for Martin Wood or Stoneham Mill were used to make home construction purchases, the purchase was returned and Denise received a refund check, but no corresponding deposit was made back into one of Ike's accounts for either Martin Wood or Stoneham Mill. Smith also testified that numerous settlement sheets were missing. Smith's examination of Lawrence's and L2's banking records enabled her to identify only $81,746 that Lawrence had spent towards the construction of his house.

Lawrence testified at trial that his house appraised in 2009 for $208,000. He agreed his house was almost 5000 square feet, it has windows and doors that were purchased for about $7000, and the house has a $7000 stereo system and a $9000 air conditioner. He also agreed the house was insured for $700,000 but he could

not explain why it was insured for more than the appraised value. He denied ever taking any money from Martin Wood or Stoneham Mill to which he was not entitled. Lawrence stated "Ike Martin didn't pay for it. I worked. My timber went in there. My lumber trucks hauled their money. I had funds coming and that was my money and I built my home."

Denise denied ever taking money from Ike, and she denied giving Lawrence any money from Martin Wood or Stoneham Mill. According to Denise, Lawrence had "committed contracts" for lumber that entitled him to be paid at a rate higher than the market rate at the time of delivery. Denise testified that "all the problems for Martin Wood Company[]" were due to Ike's construction of a new sawmill. Denise stated that Trinity had lied about bringing her receipts or cash and that "I don't know what Trinity [did] with the money. I know he didn't give it to me." Denise acknowledged that she had problems with QuickBooks but that she had not been given any training on the system, although she had requested assistance. Denise also acknowledged that numerous receipts and settlement statements that would back-up her testimony were missing. Denise also testified that she now lives in Lawrence's home, which has five bedrooms and five bathrooms, and that an insurance policy valued the house at $741,000 and its contents at $450,000, but she denied the house is worth that amount.

Ike testified that his office suffered water and storm damage from a hurricane in September 2008, and that he lost many business records as a result, but no accounting exists of exactly what records were thrown away. In Ike's opinion, Denise threw away more records than she needed to. Dennis and Trinity testified that Denise directed them to throw away papers and records after the hurricane. Ike also testified that two break-ins occurred at the Martin Wood office in 2009, and as a result, he lost two computers and more business records, including a file that contained settlement sheets for L2.

The jury found Denise "guilty of the offense of theft, as charged in the indictment." The court sentenced Denise to fifty years confinement in the Texas Department of Criminal Justice. Denise filed a Motion for New Trial and Motion in Arrest of Judgment, which was denied by operation of law. *See* Tex. R. App. P. 21.8(a), (c). Denise timely appealed.

SUFFICIENCY OF THE EVIDENCE

In her first issue, Appellant argues that the evidence is legally and factually insufficient to support her conviction for aggregate theft in the amount of $200,000 or more. Appellant's brief admits that the evidence was sufficient to show that "[t]he total amount of theft parts supported by the evidence is $146,039.62." Appellant's brief also concedes that the record includes sufficient evidence to

11

support $37,876.21 in overpayments to Lawrence made by Denise. However, she argues that the State failed to present evidence as to several specific transactions or checks upon which it relied, and that the complaining witness, Ike Martin, did not testify that certain checks were misappropriations or unauthorized. As to the checks made payable to Trinity upon which the State relied, Appellant argues that, although Trinity testified he cashed these checks and gave the money to Appellant, Trinity did not testify regarding Appellant's use of such money, so that the evidence did not support a conclusion that the checks to Trinity were unlawful appropriations. Appellant also argues that one of the checks the State relied on was written to Lowe's, and that the evidence showed the bank did not honor this check. Appellant concludes that, therefore, the evidence does not show any loss of money to Ike Martin, Martin Wood, or Stoneham Mill as a result of the check to Lowe's.

Appellant also argues that the evidence at trial does not support a conviction for aggregate theft pursuant to one scheme or common course of conduct:

> There are two main categories of theft for which Appellant is convicted: (1) writing checks to vendors for non-business purposes and writing fraudulent checks for reimbursements; and, (2) paying too high of a price for lumber receivables and paying for lumber that isn't delivered. There are inherently different schemes involved in each category. There is no easier way to show that the schemes are different than to identify the steps which need to be taken in order to discover that a theft has occurred.

12

The State argues that "[A]ppellant's conduct in committing both the overpayment of timber and the unauthorized check transactions involved substantial overlap and were committed to achieve the primary goal of funding the construction of a house." Citing to *Johnson v. State*, 187 S.W.3d 591 (Tex. App.— Houston [14th Dist.] 2006, pet. ref'd), the State argues that all the overpayments and unauthorized transactions constituted a single offense "[b]ecause the general scheme was similar in nature and was calculated to achieve a primary goal[.]" More specifically, the State argues that as to both the overpayments and unauthorized transactions,

> . . . the appellant utilized her position of employment to steal from her employer over the same time period, she did so by issuing unauthorized payments via check issued on the employer's behalf, those payments often included overpayment for legitimate purchases, and she did so for the benefit of herself and Lawrence. Although, as the appellant suggests, the mechanics of analyzing the paper trail to prove each theft are somewhat different, the conduct itself is extremely similar in nature. Any rational juror could have found that each type of theft was pursuant to the same scheme or continuing course of conduct.

When an appellant challenges the sufficiency of the evidence supporting a conviction in a criminal case, appellate courts consider all of the evidence in a light most favorable to the verdict and decide, after reviewing the evidence in that light, whether a rational trier of fact could have found the appellant guilty of the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443

13

U.S. 307, 318-19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). In reviewing sufficiency challenges, we are required to give the jury's findings and its conclusions deference, as it was the jury's responsibility to fairly resolve all conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to resolve whether the defendant is guilty of violating the criminal provision that is at issue at trial. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 808-09 (Tex. Crim. App. 2015) (citing *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13). "'When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.'" *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016) (quoting *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014)). The jury, as the judge of the facts and credibility of the evidence, may choose to believe or not believe the witnesses, or any portion of their testimony, despite contradictory

14

evidence. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (citing *Esquivel v. State*, 506 S.W.2d 613 (Tex. Crim. App. 1974)).

One Scheme or Continuing Course of Conduct

Section 31.09 of the Penal Code provides that

> [w]hen amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense.

Tex. Penal Code Ann. § 31.09. In drafting section 31.09, the legislature did not attach any technical or particular meaning to "scheme" or "continuing course of conduct"; therefore, we must give these words their common meaning. *See* Tex. Penal Code Ann. §§ 31.01, 31.09; *Sendejo v. State*, 676 S.W.2d 454, 456 (Tex. App.—Fort Worth 1984, no writ). "Scheme" and "continuing course of conduct" are terms of common understanding and need not be defined by the trial court. *Sendejo*, 676 S.W.2d at 456.

Smith, a certified fraud examiner, testified that Denise unlawfully appropriated a total of $242,798.03 from two designated First Bank of Conroe accounts for Stoneham Mill and Martin Wood. Of this total, Smith testified that $203,291.04 was theft by unauthorized checks and $38,506.99 was theft by

15

overpayments to L2, Inc.[2] Ike testified that the primary way Denise obtained money out of his bank accounts was from writing checks.

Ike believed that Denise and Lawrence then used the money they stole from Ike, Stoneham Mill, and Martin Wood to pay for the construction of a house in which Denise and Lawrence lived at the time of the trial. Ike also testified that many of the checks upon which the State was relying pertained to construction of Lawrence's home, which is now also Denise's home, and Ike expressly testified that Ike never authorized Denise to write checks for this purpose. Trinity testified that "Lawrence used [Denise] to get cash in order to build him a home[.]" Ike further testified that Denise wrote checks to pay for logging expenses (e.g., fuel, tires, and parts) incurred by Lawrence or by L2, and that such payments were not deducted on later settlements or payments to Lawrence or to L2. Ike also testified that the checks did not represent a business expense on behalf of himself, Martin Wood, or Stoneham Mill. Ike agreed that Denise's thefts escalated about the time she filed for divorce from Ray. Patricia testified that, in her audit of the finances, she found settlement sheets showing Lawrence was paid for more wood than he actually dropped off or he was paid for a higher grade of wood (and at a higher pay

---

[2] We take judicial notice that $203,291.04 plus $38,506.99 equals $241,798.03. *See* Tex. R. Evid. 201. Smith did not address this $1000 discrepancy in her testimony.

16

rate) than what he actually delivered. Smith testified that her forensic analysis showed that sometimes advances to L2 employees were properly deducted from settlements to L2 or Lawrence, but that sometimes they were not. Smith also testified that the records show Lawrence was overpaid in three ways: by applying the wrong price, by applying the wrong weight, or by failing to deduct previous payments or advances.

Viewing the evidence in the light most favorable to the verdict, we find that a rational jury could have found that Appellant's acts constituted one scheme or a continuing course of conduct. *See Johnson*, 187 S.W.3d at 603-04. Although some misappropriations consisted of overpayments to Lawrence or to L2, Inc. and other misappropriations consisted of unauthorized checks or payments, a rational jury could have concluded that all such misappropriations were "pursuant to one scheme or continuing course of conduct[.]" *See* Tex. Penal Code Ann. § 31.09. We overrule Appellant's argument that the transactions on which the State relied were not pursuant to one scheme or a continuing course of conduct.

Sufficiency Analysis

In her appellate brief, Appellant concedes that the evidence is sufficient to support theft in the amount of $146,039.62, as itemized in various checks that appellant wrote, and that the evidence was sufficient to establish that Appellant

17

made unauthorized payments (or overpayments) to Lawrence or L2 for timber totaling $37,876.21. Accordingly, the disputed amount would encompass an additional $16,084.17 of misappropriations that would be required to support the jury's finding of aggregate theft over $200,000.[3]

Appellant's brief itemizes twenty-seven checks she disputes. The State also addresses the disputed checks or transactions in its brief. On the record before us, we conclude that the evidence is legally and factually sufficient to support the jury's finding that Denise misappropriated more than $200,000 from Ike, Martin Wood, or Stoneham Mill from the designated First Bank of Conroe accounts pursuant to a single scheme or a continuing course of conduct.

*a. Disputed Checks Payable to Trinity or Leah.*

Of the twenty-seven checks Appellant disputes on appeal, thirteen were made payable to Trinity and three were made payable to Leah, and both the State and the defense entered copies of these checks into evidence. All of the disputed checks made payable to Trinity or Leah were written on one of the First Bank of Conroe accounts identified in the amended indictment and in the jury charge. A summary of First Bank of Conroe "Checks Made Payable To Trinity To Rely On

---

[3] $200,000.00 (amount to be proven by the State) - $146,039.62 (undisputed amount of unauthorized checks) - $37,876.21(undisputed amount of overpayments to Lawrence Dirden) = $16,084.17.

18

In Trial" was also admitted into evidence as a summary of voluminous records, and it itemizes fifty-five checks written in 2008 to Trinity totaling $55,161.42. All thirteen of the disputed checks to Trinity are listed on this summary exhibit.

The thirteen disputed checks made payable to Trinity total $11,843.47. The three disputed checks made payable to Leah total $15,300. Together, all the disputed checks to Trinity and Leah total $27,143.97. Both Trinity and Leah testified that Denise wrote the checks made payable to them, that Trinity and Leah then cashed the checks, and then Trinity and Leah gave the cash to Denise. However, Trinity also testified that on two or three occasions, Denise directed him to use the cash to cover a check that had bounced. All but one of the disputed checks made to Trinity appear to have been signed with Ike's signature stamp; however, Ike testified that the checks listed in "Checks Made Payable To Trinity To Rely On In Trial" were all unauthorized. Two of the three checks made to Leah were signed by Denise.

### b. *Disputed Checks Written After October 24, 2008.*

The State argues that the checks written after October 24, 2008, were all unauthorized because Ike testified that after he opened the Woodforest bank account, the First Bank of Conroe accounts should not have been used. The disputed checks include five checks written after October 24, 2008. The State

19

offered into evidence a business record showing that Ike opened an account with Woodforest National Bank for Stoneham Mill on October 24, 2008. Ike testified that, after he opened the Woodforest bank account in 2008, all moneys coming into Stoneham Mill should have been deposited into the Woodforest account. More specifically he agreed he let Denise know "we're not using First Bank of Conroe anymore[.]" Smith also testified that Ike opened the Woodforest account on October 24, 2008, and she agreed that the First Bank of Conroe account for Stoneham Mill was not to be used thereafter.

For purposes of our review we note that, even if we consider only the Stoneham Mill checks written after October 24, 2008, of which there are four, the evidence establishes the following: one of those four checks was made out to Leah, and we have already addressed checks made out to Leah; the three remaining checks written after October 24, 2008, were made out to Home Depot, Denise, and Lowe's, and they total $11,370.51. Accordingly, the evidence reflects that three additional disputed checks totaling $11,370.51 were written after Ike opened the Woodforest bank account and after he instructed Denise not to use Stoneham's First Bank of Conroe account.

In addition to the evidence summarized above, the jury also heard testimony from Denise about her explanation regarding the financial problems of the

businesses, that some of the financial problems suffered by Martin Wood and Stoneham Mill resulted from the construction of a new sawmill, that it was common practice for Martin Wood to advance funds to loggers and that Denise was authorized to do so, that Trinity told "a lot of untruths[,]" that there were problems with the QuickBooks records because she never received any training on the system, and that Denise did not take any money from Ike nor did she give Lawrence any money that was not due to him. Regarding the disputed check to Lowe's, Denise testified that Lawrence actually paid for a cashier's check that they used to cover the Stoneham Mill bounced check so that neither Martin Wood nor Stoneham Mill would have lost any money on this transaction. Smith testified that she could not determine the source of funds that Lawrence or Denise used to cover the Lowe's check. And, Lawrence denied that he took any money from Ike or from Stoneham Mill to which he was not entitled.

We defer to the jury's assessment of the credibility of the witnesses and the weight to be given their testimony, and we presume that the jury resolved any conflicts in favor of the verdict. *See Blea*, 483 S.W.3d at 33; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Accordingly, on the record before us, we conclude that a rational jury could have found that at least $27,143.97 of disputed checks made out to Trinity and Leah were unauthorized. A rational jury could also

21

have found that additional disputed checks totaling $11,370.51 were written after Ike opened the Woodforest account and after he directed Denise not to use the First Bank of Conroe account for Stoneham Mill, and that such checks were unauthorized. And, as we have noted, Smith testified that her forensic analysis showed $203,291.04 in theft by unauthorized checks. Therefore, the jury could have concluded, based upon the cumulative evidence and reasonable inferences therefrom, the evidence was legally and factually sufficient to support the jury's conviction for aggregate theft in the amount of at least $200,000 pursuant to a single scheme or a continuing course of conduct. The record is sufficient to show that at least $16,084.17 among the checks disputed on appeal represented misappropriations from one of the First Bank of Conroe accounts specified in the amended indictment. Together with the $183,915.83 in unauthorized checks and overpayments that Appellant does not dispute on appeal, the evidence was legally and factually sufficient to support the jury's conviction for aggregate theft in the amount of at least $200,000 pursuant to a common scheme or a continuing course of conduct. We overrule Appellant's first issue.

### JURY CHARGE

In her second issue on appeal, Appellant argues that the charge was erroneous because it did not instruct the jurors "that they need to unanimously

agree about what property was stolen from which owners[]" and the instruction "allows for the jury to convict Appellant with less than a unanimous verdict as to the property stolen and owner." In her third issue, Appellant argues the jury charge was erroneous because "it [did] not inform the jury which transactions are to be considered." Appellant argues that although the State had filed a list of the transactions it relied on, the list was not provided to the jury. According to Appellant, both errors resulted in egregious harm because they deprived her of Constitutional protections and because the resulting punishment is greater than what would be probable had the jury charge not been erroneous. The State argues on appeal that Appellant did not object to potential error in the jury charge and that Appellant's brief on appeal does not state where she made any such objection at trial.

Our first duty in analyzing a jury-charge issue is to determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Preservation of charge error does not become an issue until we assess harm. *Id*. When the defendant failed to object to potential error in the jury charge, if error occurred, reversal is only required if the appellant suffered egregious harm. *Id*. at 749.

Jury unanimity is required in felony and misdemeanor jury trials. *Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011). "'[U]nanimity is required on

23

the essential elements of the offense' but is 'generally not required on the alternate modes or means of commission.'" *Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007) (quoting *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006)); *see also Lehman v. State*, 792 S.W.2d 82, 85 (Tex. Crim. App. 1990) (A defendant who has received proper notice of allegations of theft of a certain "bundle" of property should not be acquitted if there is sufficient evidence to show him guilty of stealing enough of the "bundle" to make him guilty of the offense alleged.); *Stafford v. State*, 248 S.W.3d 400, 406 (Tex. App.—Beaumont 2008, pet. ref'd) (jury unanimity is not required as to the manner and means by which the defendant committed the crime charged).

In support of her argument on appeal that the jury was required "to unanimously agree about what property was stolen from which owners," Appellant cites to the Houston Court of Appeals opinion in *Kent v. State*, 447 S.W.3d 408, 419 (Tex. App.—Houston [14th Dist.] 2014), which held that "when an aggregate theft offense is predicated on Section 31.03, the jury must unanimously agree about what property was unlawfully appropriated and who owned it." After Appellant filed her appellate brief in this case, the Court of Criminal Appeals reversed the Houston Court of Appeals, holding that, as to a charge of aggregated theft,

> . . . unanimity requires that the jurors agree that the threshold amount has been reached and that all the elements are proven for each specific instance of theft that the individual juror believes to have occurred. Every instance of theft need not be unanimously agreed upon by the jury.

*Kent v. State*, 483 S.W.3d 557, 562 (Tex. Crim. App. 2016); *see also Johnson v. State*, 364 S.W.3d 292, 296 (Tex. Crim. App. 2012) ("The Supreme Court has explained that a 'jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, [for instance], which of several possible means the defendant used to commit an element of the crime.'") (quoting *United States v. Richardson*, 526 U.S. 813, 817 (1999)). When a defendant is charged with aggregated theft of an amount pursuant to one scheme or continuing course of conduct, the State is not required to prove each individual appropriation. *Eastep v. State*, 941 S.W.2d 130, 135 (Tex. Crim. App. 1997), *overruled on other grounds by Gollihar v. State*, 46 S.W.3d 243, 256-57 (Tex. Crim. App. 2001) and *Riney v. State*, 28 S.W.3d 561, 565-66 (Tex. Crim. App. 2000); *Lehman*, 792 S.W.2d at 84-85. The evidence will be sufficient if the State proves that the defendant "illegally appropriated enough property to meet the aggregated value alleged." *Eastep*, 941 S.W.2d at 135. Accordingly, jury unanimity was not required as to each appropriation that the State alleged Denise committed.

A hypothetically correct jury charge is one that "'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

In the case at bar, the jury charge specified the aggregate amount of misappropriation, the victims, the two specific First Bank of Conroe, N.A. accounts affected, and the period of time over which the "scheme or continuing course of conduct" was alleged to have occurred. Appellant cites no authority for the proposition that the jury charge must also itemize each specific transaction, and we find no legal support for her argument. *See* Tex. R. App. P. 38.1(i) (an appellate brief must cite to applicable authority); *see also Kent*, 483 S.W.3d at 561 (under section 31.09, the indictment need not allege the specific acts of theft and a jury charge that tracks the indictment is proper) (citing *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003)). We reject Appellant's arguments and conclude that the jury charge was not erroneous. We need not determine whether any egregious harm resulted. We overrule issues two and three on appeal.

In issue four, Appellant argues that the trial court abused its discretion in allowing improper jury argument wherein the State urged the jury to consider evidence of thefts that were outside the scope of the indictment in determining guilt. Appellant's brief refers to closing argument, during which the prosecutor mentioned "where from 11-21-07, until the time she wrote that check, she was taking hundreds and hundreds and thousands of dollars out of Prosperity [Bank]." Denise's attorney objected to that statement at trial by stating the prosecutor was "arguing outside of the evidence" in referring to transactions that occurred in 2007. The court overruled the objection, explaining "This is just argument."

Appellant's brief also complains that the prosecutor "urge[d] the jury to consider checks written on the Prosperity bank account as probative evidence[.]" Appellant contends that

> [i]t is obvious that all of the discussion about Prosperity checks, and the State's jury argument, confuses the jury. The jury's first question during deliberations specifically requests instructions as to whether they can consider checks from the Prosperity account in determining the aggregate amount of the thefts.

Proper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement.

27

*Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Error exists when the argument includes facts not supported by the record, but such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper. *Id.* (citing *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988)).

In this matter, the jury trial included testimony and other evidence concerning Prosperity Bank transactions. During the State's examination of Ike, the prosecutor asked him about certain checks written out of a Prosperity Bank account. The defense objected, arguing that any Prosperity Bank checks "go beyond the context of what's being alleged in this case[.]" The court allowed the evidence but gave the following limiting instruction:

> Ladies and gentlemen, the evidence you're about to hear, if I understand where [the prosecutor] is going with this case, is going to involve allegations in another bank. You're only to use those allegations to rebut any mistake in the testimony, any proof of motive, opportunity, design, plan, scheme, anything that would go to show and support that is the only reason you are supposed to use this evidence.

Later in the trial, when the State sought to admit evidence pertaining to a Prosperity Bank account, the defense objected, and the trial court overruled the objections and gave another limiting instruction:

> Ladies and gentlemen of the jury, the next exhibit, State's [Exhibits] 24 and 25, you're not to consider them for any purpose

28

other than to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In other words, the State is not relying on these as the body of evidence in this case, only to show those things I just listed.

Certain exhibits admitted into evidence—including some of the defendants' exhibits—also pertained to transactions that occurred in 2007. Therefore, the trial court could reasonably have determined that the prosecutor's argument concerning Prosperity Bank transactions or transactions that occurred in 2007 was proper as a summation of the evidence. *See* Tex. R. Evid. 1006; *Johnson v. State*, 208 S.W.3d 478, 507-10 (Tex. App.—Austin, 2006, pet. ref'd) (spreadsheets summarizing thousands of phone calls were properly admitted as summaries of voluminous records where the phone records on which the spreadsheets were based were "voluminous, admissible, and made available to appellant for examination and copying[]"); *Alarid v. State*, 762 S.W.2d 659, 662 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd) (in a prosecution for theft of property valued at $20,000 or more pursuant to a common scheme or continuing course of conduct, no error to admit summary of the transactions in which defendant was involved where certified records of the individual transactions were available in court). According to the appellate record, when the jury asked whether it could consider checks from the Prosperity Bank account, the court responded: "Please refer to the charge and continue your deliberations." The relevant portion of the jury charge instructed that

29

. . . if you find from the evidence beyond a reasonable doubt that in Montgomery County, Texas, the defendant, Denise Dirden (aka Denise Pressley and/or Denise Howard), either acting alone or together as a party with Lawrence Dirden, and/or Trinity Howard and/or Leah Howard and/or Patricia Brown, did then and there unlawfully appropriate property, by acquiring or otherwise exercising control over the property, to wit: money, in the aggregate value of $200,000 or more, from Isaac Martin III, and/or Martin Wood Company, Inc. and/or Stoneham Mill, Inc[.], the owner, from account number(s)1003706 and 1047786 at First Bank of Conroe, N.A, with the intent to deprive the owner of property, and said property was obtained pursuant to one scheme or continuing course of conduct that began on or about January 28, 2008 and continuing through on or about December 16, 2008, then you will find the defendant guilty as charged in the indictment.

We assume the jury followed the court's instruction. *See Miles v. State*, 204 S.W.3d 822, 827-28 (Tex. Crim. App. 2006) ("[I]n the absence of evidence to the contrary, we will assume that the jury followed its written instructions."). Because the jury instruction limited the scope of evidence the jury could consider as probative of guilt, the prosecutor's remarks of which Dirden now complains were not extreme or manifestly improper and do not require reversal. *See Brown*, 270 S.W.3d at 570. We overrule Appellant's fourth issue on appeal.

DOUBLE JEOPARDY

In her fifth issue, Appellant raises a double-jeopardy claim, arguing that her prosecution for aggregate theft in Montgomery County is barred by double jeopardy because she had been previously tried for aggregate theft in Liberty

30

County for conduct that was part of the same scheme or continuing course of conduct. Based on her double-jeopardy claim, Appellant requests this Court to "abate the appeal and remand the case for a hearing to supplement the record with the relevant details of Appellant's trial in Liberty County[.]"

The Double Jeopardy Clause of the United States Constitution is applicable to the states through the Fourteenth Amendment, and it protects an accused from impermissible multiple punishments or successive prosecutions for the same offense after an acquittal or conviction. U.S. Const. amend. V; *see Ex parte Amador*, 326 S.W.3d 202, 205 (Tex. Crim. App. 2010). The constitutional proscription against double jeopardy protects against (1) a second prosecution for the same offense after an acquittal, (2) a second prosecution for the same offense following a conviction, and (3) multiple punishments for the same offense. *Speights v. State*, 464 S.W.3d 719, 722 (Tex. Crim. App. 2015) (citing *Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014)); *Ex parte Chaddock*, 369 S.W.3d 880, 883 (Tex. Crim. App. 2012). Here, Appellant claims she was prosecuted a second time for conduct that was "part of the same scheme or course of conduct" and that "[s]ince it is all part of the same unit of prosecution, Appellant's prosecution in this case (the second case tried) violates Appellant's constitutional right not to be put in Jeopardy twice for the same conduct."

31

"For offenses to be the 'same' for double-jeopardy purposes, they must be the same both in 'law' and in 'fact.'" *Aekins v. State*, 447 S.W.3d 270, 283 (Tex. Crim. App. 2014) (Keller, P.J., concurring) (citing *Ex parte Hawkins*, 6 S.W.3d 554, 557 n.8) (Tex. Crim. App. 1999)). Under the *Blockburger* same-elements test, we inquire as to whether each offense contains an element not contained in the other; if not, they are the same offense and double jeopardy bars additional punishment and successive prosecution. *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). When the offenses in question are proscribed by a single statute or are otherwise the same under an "elements" analysis, the protection against double jeopardy is not violated if the offenses constitute separate allowable units of prosecution. *Ex parte Benson*, 459 S.W.3d 67, 73 (Tex. Crim. App. 2015). "A 'units' analysis consists of two parts: (1) what the allowable unit of prosecution is, and (2) how many units have been shown." *Id.* (footnote omitted). "The allowable unit of prosecution of an offense turns on statutory construction and usually requires ascertaining the gravamen, or gravamina, of the offense." *Ex parte Castillo*, 469 S.W.3d 165, 169 (Tex. Crim. App. 2015). "Theft has two gravamina: the property and ownership." *Johnson*, 364 S.W.3d at 297; *Byrd v. State*, 336 S.W.3d 242, 250-51 (Tex. Crim. App. 2011) ("[T]he gravamen of theft is two-pronged—taking certain specified

32

property away from its rightful owner or depriving that owner of its use or enjoyment."). In determining units of prosecution for theft, "property" means "the identity of the property that was appropriated, not the method by which the property was appropriated." *Johnson*, 364 S.W.3d at 297 n.32 (citing *Byrd*, 336 S.W.3d at 250-51 & 250 n.40).

Appellate Rule 33.1 provides that as a prerequisite to presenting a complaint for appellate review, the record must show that the party "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint[.]" Tex. R. App. P. 33.1; *see also Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005). To determine preservation of error under Rule 33.1, the issue is whether the "complaining party on appeal brought to the trial court's attention the very complaint that party is now making on appeal." *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002) (citing *State v. Mercado*, 972 S.W.2d 75, 78 (Tex. Crim. App. 1998)); *see also Reyna*, 168 S.W.3d at 177. Although an imprecise objection may preserve error when the specific grounds were apparent from the context, in certain circumstances more precision is required to adequately preserve a complaint for review on appeal. *See* Tex. R. App. P. 33.1(a)(1)(A); *Reyna*, 168 S.W.3d at 179; *Taylor v. State*, 939 S.W.2d 148, 155 (Tex. Crim. App. 1996).

A criminal defendant has the burden to preserve her double-jeopardy complaint by objecting at or before the time the charge is submitted to the jury. *Gonzalez v. State*, 8 S.W.3d 640, 647 (Tex. Crim. App. 2000). And a defendant may forfeit a potential double-jeopardy claim if she fails to properly preserve the claim. *See Langs v. State*, 183 S.W.3d 680, 686 (Tex. Crim. App. 2006) (citing *Gonzalez*, 8 S.W.3d at 642-43). The Texas Court of Criminal Appeals has explained that generally a defendant bringing a double-jeopardy "multiple prosecutions claim" should file a petition for a pretrial writ of habeas corpus. *Gonzalez*, 8 S.W.3d at 643 n.9. A pretrial writ is the preferred method of bringing a multiple prosecutions claim because the defendant may immediately appeal if the trial court denies the petition. *See id.*; *Kelson v. State*, 167 S.W.3d 587, 591 (Tex. App.—Beaumont 2005, no pet.). By contrast, a special plea of former jeopardy is the method available to a defendant when the double-jeopardy claim is based on "multiple punishments" (as distinguished from multiple prosecutions), and when timely raised, a special plea of former jeopardy must be submitted to the jury along with a plea of not guilty. *Bailey v. State*, 87 S.W.3d 122, 123 n.2 (Tex. Crim. App. 2002) (citing *Apolinar v. State*, 820 S.W.2d 792, 793 (Tex. Crim. App. 1991) (en banc)); *Kelson*, 167 S.W.3d at 592; *see* Tex. Code Crim. Proc. Ann. arts. 27.05, 27.07 (West 2005) (all fact issues "presented by a special plea shall be tried by the

34

trier of the facts on the trial of the merits").[4] In the case at bar, Appellant did not file a pretrial writ of habeas corpus nor did she make a special plea of former jeopardy.

An appellant may also raise a double-jeopardy claim for the first time on appeal if two conditions are met: (1) the undisputed facts show the double-jeopardy violation is clearly apparent from the face of the record, and (2) enforcement of usual rules of procedural default serves no legitimate state interest. *See Gonzales*, 8 S.W.3d at 643; *see also Bigon v. State*, 252 S.W.3d 360, 369 (Tex. Crim. App. 2008).

In her brief, Appellant acknowledges that "the record in this case does not contain the indictment or judgment from the Liberty County case," but argues that "the record has many references to the fact that Appellant has previously been tried

[4] Article 27.05 of the Texas Code of Criminal Procedure provides:
A defendant's only special plea is that he has already been prosecuted for the same or a different offense arising out of the same criminal episode that was or should have been consolidated into one trial, and that the former prosecution:
(1) resulted in acquittal;
(2) resulted in conviction;
(3) was improperly terminated; or
(4) was terminated by a final order or judgment for the defendant that has not been reversed, set aside, or vacated and that necessarily required a determination inconsistent with a fact that must be established to secure conviction in the subsequent prosecution.
Tex. Code Crim. Proc. art. 27.05 (West 2006).

in Liberty County." At trial, Denise's attorney objected to the introduction of certain exhibits and testimony arguing "this stuff is double jeopardy. This is the case that was presented in Liberty County, therefore it's double jeopardy." The trial court overruled the objection. Later in the trial, the defense again objected to the admission of certain evidence pertaining to a bank account other than one of the accounts specified in the amended indictment, arguing "This is Liberty County stuff. This has already been tried." The court responded, "The door's open. Objection is overruled." Appellant's objections at trial to the admissibility of evidence are insufficient to preserve or notify the trial court that she was asserting a double-jeopardy challenge to the prosecution as a whole. *Cf. Reyna*, 168 S.W.3d at 179.

Because Appellant failed to raise a double-jeopardy claim during trial, it is her burden on appeal to prove that the undisputed facts "show the double jeopardy violation is clearly apparent on the face of the record[.]" *Gonzalez*, 8 S.W.3d at 643. Appellant claims that her prior conviction in Liberty County bars her prosecution in Montgomery County for the "same scheme or course of conduct[.]" The appellate record includes neither the Liberty County indictment nor the judgment. However, our examination of the clerk's record reveals that the State

made the following argument to the trial court in its Motion for Joint Trial of Two Separately Charged Defendants:

> On or about April 26, 2013, Denise Dirden (also known as Denise Pressley and Denise Howard) was tried in the 75th District Court of Liberty County, Texas, for the felony charge of aggregate theft in an amount over $200,000 from Isaac Martin, III and/or Martin Wood Company from account number 3876571 at Prosperity Bank. The [sic] Denise Dirden was convicted of aggregate theft in an amount greater than $20,000 but less than $100,000 and was sentenced to 5 years in the Texas Department of Criminal Justice - Institutional Division.

Additionally, in the State's Notice of Extraneous Acts that was filed by the State prior to trial, the State alleged that:

> Denise Dirden and Lawrence Dirden, II, were charged in Liberty County with Aggregate theft in an amount greater than $200,000 in cause numbers CR29833 and CR2983. Specifically the Defendants were charged with the following: ". . .did then and there pursuant to one scheme or continuing course of conduct that began on the [sic] or about the 1st day of November 2007, and continued until on or about the 31st day of March 2009, unlawfully appropriate, by acquiring or otherwise exercising control over the property, to-wit: money, from Isaac Martin III, and/or Martin Wood Company, Inc. the owner thereof, from account number 3876571 at Prosperity Bank, with intent to deprive the owner of the property, and the aggregate value of the property obtained was $200,000 or more. . ."

Denise did not put any evidence into the record during her Montgomery County trial regarding the Liberty County indictment or judgment. Although Denise filed an objection to the Motion for Joint Trial, she did not dispute the State's characterization of her Liberty County indictment or conviction.

37

As we have already noted, the jury charge in this case asked the jury to decide whether Denise unlawfully appropriated property, by acquiring or exercising control over "the property, to wit: money, in the aggregate value of $200,000 or more, from Isaac Martin III, and/or Martin Wood Company, Inc. and/or Stoneham Mill, Inc[.], the owner, from account number(s)1003706 and 1047786 at First Bank of Conroe, N.A[.]" While the ownership of the property may have been similar in both the Liberty County and Montgomery County cases, we cannot say on the record before us that all of the owners were the same or that all of the property was the same. The record suggests only that Denise's prior conviction in Liberty County pertains to thefts of money from a Prosperity Bank account. Furthermore, the record suggests that the Liberty County indictment only identified Ike and Martin Wood as theft victims, while the indictment and amended indictment in the case at bar identified Ike, Martin Wood, and Stoneham Mill as the owners of the property. Consequently, we cannot conclude from the face of the record in this case that Denise's trial in Montgomery County was for the "same offense" or was the same "unit of prosecution" as in her prior prosecution and conviction in Liberty County. We overrule Appellant's fifth issue on appeal

because nothing on the face of the record shows a double-jeopardy violation.[5] *See Gonzalez*, 8 S.W.3d at 643.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In her sixth and final issue, Appellant argues that she did not obtain the effective assistance of counsel at trial because her trial counsel failed to file a motion to quash the indictment based on double jeopardy. Appellant argues that "the indictment is based on an improper theory of law[]" and no valid trial strategy would support failing to file a motion to quash indictment based on double jeopardy.

To prevail on an ineffective assistance claim, Appellant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A failure to make either the required showing of deficient performance or

---

[5] On appeal, Appellant requested that this Court grant her an abatement of this appeal in order to supplement the record with evidence regarding the Liberty County case. Texas Rule of Appellate Procedure 34.6(d) pertains to the supplementation of the appellate record with items that were otherwise part of the trial but does not permit a party to supplement the record with evidence that was not offered or admitted during the proceedings in the trial court. *See id.*; *see also Carver v. State*, No. 08-12-00298-CR, 2015 Tex. App. LEXIS 922, at **29-30 (Tex. App.—El Paso Jan. 28, 2015, pet. ref'd) (mem. op., not designated for publication).

39

sufficient prejudice defeats the claim of ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if Appellant rebuts the strong presumption that her counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142. The record must contain evidence of counsel's reasoning, or lack thereof, to rebut the presumption. *See Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007). We review the totality of the representation rather than isolated instances in determining whether counsel was ineffective. *See Lopez*, 343 S.W.3d at 143; *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). In some cases a "single egregious error" may constitute ineffective assistance of counsel. *See Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013) (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). However, an isolated failure to object generally does not constitute ineffective assistance. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984); *see also Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim.

App. 2004) (analysis an ineffective assistance claim considers the "totality of the representation" rather than isolated acts or omissions of trial counsel).

In this matter, the record is silent on trial counsel's reasons for not filing a motion to quash the indictment or some other pretrial pleading to raise a double jeopardy challenge. Appellant did not file a motion for new trial alleging ineffective assistance of counsel or otherwise develop a record of trial counsel's reasons for his actions. Without testimony from trial counsel, the court must presume counsel had a plausible reason for his actions. *Gibbs v. State*, 7 S.W.3d 175, 179 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). We have already determined, a double jeopardy violation is not clearly apparent on the face of the record before us. We conclude that Appellant has failed to rebut the presumption that counsel acted reasonably. *See, e.g.*, *Thompson*, 9 S.W.3d at 814; *Stephenson v. State*, 255 S.W.3d 652, 660 (Tex. App.—Fort Worth 2008, pet. ref'd). The second part of the *Strickland* test requires an appellant to show that there is a reasonable probability that the outcome of her case would have been different but for counsel's errors. *Strickland*, 466 U.S. at 694. Having concluded that Appellant failed to satisfy the requirements of the first *Strickland* prong, we need not address the second prong. *See Williams*, 301 S.W.3d at 687. We overrule Appellant's sixth issue. *See* Tex. R. App. P. 47.1.

REFORMATION OF JUDGMENT

We note that the section of the judgment entitled "Statute for Offense" recites only "31.03[.]" Section 31.03 of the Texas Penal Code defines the offense of theft, whereas Denise's indictment and amended indictment indicate she was indicted under section 31.09 of the Texas Penal Code, which defines the offense of aggregate theft. *See* Tex. Penal Code. Ann. §§ 31.03, 31.09. The jury charge also tracks the statute for aggregate theft. This Court has the authority to reform the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993). We therefore reform the judgment to add a citation to "31.09" to that section of the judgment stating the statutory references for the offense.

Having overruled all of Appellant's issues on appeal, we affirm the judgment of the trial court as reformed. As explained herein, we also deny Appellant's motion to abate the appeal.

AFFIRMED AS REFORMED.

_____
LEANNE JOHNSON
Justice

Submitted on December 1, 2015
Opinion Delivered August 24, 2016
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.

42