

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DESIREE BOLTOS, | § | No. 08-19-00020-CR |
| Appellant, | § | Appeal from the |
| v. | § | Criminal District Court No. 3 |
| THE STATE OF TEXAS, | § | of Tarrant County, Texas |
| Appellee. | § | (TC# 1568696R) |

**O P I N I O N**

The "golden years" should be a time to enjoy the fruits of a lifetime's work. But for some, it is a time of loneliness and isolation. In this case, the State accused Desiree Boltos, Appellant, of capitalizing on six lonely seniors and divesting them of significant sums of money. After a jury found her guilty on a six-count indictment, she was sentenced to an 85-year, 75-year, 68-year, 20-year, 15-year and 10-year term of confinement under the respective counts. The sentences run concurrently, but each also garnered the maximum $10,000 fine. In this appeal, Appellant challenges (1) the sufficiency of the evidence to support her conviction, (2) whether some of the counts overlap and violate double jeopardy, (3) the failure to suppress evidence from email accounts obtained under a warrant, and (4) the legality of a subpoena for bank records. Finding no merit in these claims, we affirm the conviction and sentence.

1

# I. BACKGROUND

## A. The Indictment

The State indicted Appellant on five counts of theft of property and one count of exploitation of an elderly person. Count one of the indictment alleged unlawful appropriation of property belonging to five named victims (James Olmstead, Paul Wilbur, Danny Barnett, Richard Lima, and Lois Cardin), with an aggregate value of over $300,000. That count alleged the theft occurred as part of a single scheme or course of conduct between December 28, 2011 and May 4, 2017. Counts two, three, four, and five alleged unlawful appropriation of property from four named persons: Paul Wilbur (count 2, more than $200,000); Douglas Wingo (count 3, a Silverado truck); James Olmstead (count 4, more than $200,000); and Richard Lima (count 5, more than $150,000). Finally, count six charged Appellant with exploitation of an elderly person, Paul Wilbur, by obtaining money through deception.

## B. Factual Background

During a five-day jury trial, punctuated by twenty-five witnesses, and thousands of pages of exhibits, the State developed the following case against Appellant as to each of the six victims alleged in the indictment:

### 1. Danny Barnett

In January of 2012, Appellant met Danny Barnett. At the time, he was 72 years of age, and she was 32. They began a "romantic" relationship, and Appellant asked Barnett to marry her so she could secure health insurance to pay for her purported cancer surgeries. They married in April of 2012, although they never lived together. Appellant failed to disclose that she was already involved in a common-law marriage with Paul Hill, who was the father of her children. Barnett purchased a home for her, where she lived with her common-law husband and her children.

Barnett also purchased a luxury vehicle for Appellant. She falsely represented that she needed money for several surgeries, for which Barnett paid. Appellant also cashed his social security and worker's compensation checks, using the money for herself. When Barnett was hospitalized and did not appear to have his mental faculties, Appellant secured a power of attorney over his affairs. Barnett died on March 3, 2016. After his death, Appellant claimed to be Barnett's wife so that she could receive the proceeds of his life insurance policy. According to a forensic analyst's testimony, Appellant was able to appropriate $353,923 from Barnett.

### 2. James Olmstead

In the fall of 2012, Appellant met James Olmstead and the two began a romantic relationship shortly thereafter. At the time, Olmstead was 75 years of age. Appellant misrepresented her marital status, telling Olmstead she was single and a widow. Appellant represented that Hill (her common-law husband) was her brother. She also told Olmstead that she would need financial "help" if she were to continue seeing him. She then convinced him that she was in a probate battle in Las Vegas and needed money for legal fees and living expenses to continue the litigation. She also claimed she needed money to remove a cyst in her birth canal, and to help her "brother" Paul Hill. Olmstead and Appellant even discussed getting married. But in the summer of 2013, as Olmstead's money ran out, their affair ended. From his home in Fort Worth, Olmstead delivered Appellant a total of $297,905 through wire transfers, cash, and checks.

### 3. Paul Wilbur

In late 2013, Paul Wilbur was 75 years old when he met Appellant on a flight from Las Vegas to Dallas, Texas. Appellant again introduced Hill (her common-law husband) as her brother. Appellant falsely told Wilbur that she was an interior decorator, that she had one child,

and was raising two of her sister's children. Shortly after their romantic relationship began, Appellant requested money to support her design business. Wilbur initially sent her $70,000 for the business, and additional sums over time at her request. He also purchased two trucks for the business. She also falsely claimed to be suffering from cancer and needed money for treatments. This claim was particularly impactful to Wilbur who had lost his wife to cancer. As Wilbur's money began to run out , Appellant claimed that she and her children were homeless and living in shelters. Through this pattern of deception involving both romance and a business relationship, Appellant was able to directly obtain $428,503 from Wilbur, and another $439,908 to Hill's auto-body business on behalf of Appellant.

### 4. Richard Lima

In the fall of 2016, Appellant met Richard Lima through the "Plenty of Fish" dating website. At the time, Lima was 86 years old; Appellant was 36. Appellant claimed to be a widow who had adopted a daughter. Shortly thereafter, she requested money from him to help resolve a legal issue with her deceased husband's bank account. She also claimed to need money to support her interior design business. Appellant further requested money to pay for medical treatments for a broken leg, appendicitis, various surgeries, and cancer. Although she maintained her home in Tarrant County, Appellant claimed to be homeless, without food, and suicidal. Appellant was able to secure $127,846 from Lima.

### 5. Douglas Wingo

Between 2016 and 2017, Appellant encountered Douglas Wingo, a 67-year-old man who lived in Las Vegas. He suffered from dementia, neurological problems, and exposure to agent orange during his three tours in Vietnam. Beginning in 2011, he had been unable to make rational decisions regarding his property and his sister had a power of attorney to manage his affairs.

4

Notwithstanding these impairments, Wingo somehow purchased three new vehicles in 2017 for a total price of $230,456. The purchase documents contain a signature which does not appear to be Wingo's and an email address and telephone number that do not belong to him. One of those vehicles was located at Appellant's home in Tarrant County.

### 6. Lois Cardin

In 2017, Lois Cardin was 85 years old when she met Appellant on the Plenty of Fish online dating site. Cardin was a widow living in Florida. The two first exchanged letters and phone calls. Appellant then travelled to Florida to visit Cardin. By this time, Cardin thought her relationship with Appellant could become romantic. While in Florida, Appellant deceived Cardin into cosigning a note for a truck. Cardin believed she was simply confirming Appellant's identity. Further, after Appellant returned home, Cardin learned that Appellant had made several unauthorized charges on her credit cards to Appellant's common-law husband's purported auto business in Hurst, Texas. These credit card charges amounted to $15,600.67.

### 7. The jury charge and findings

The jury found Appellant guilty of count one (theft of greater than $300,000 beginning on or about December 28, 2011 and continuing until on or about May 4, 2017 from James Olmstead, Paul Wilbur, Danny Barnett, Richard Lima, and Lois Cardin). The jury also found Appellant guilty of the following five counts pertaining to the individual victims:

- Count two (theft of more than $200,000 beginning on January 15, 2014 and continuing until August 13, 2015 from Paul Wilbur)

- Count three (theft of a Chevrolet truck with a value between $30,000 and $150,000 from Douglas Wingo)

- Count four (theft of more than $200,000 between March 2, 2013 and June 7, 2013 from James Olmstead)

- Count five (theft of more than $30,000 but less than $150,000 between February 7, 2017 to May 4, 2017 from Richard Lima)

- Count six (exploitation of Paul Wilbur through deception)

The trial court entered judgments of conviction on each of the counts, and consistent with the jury's punishment phase findings, sentenced Appellant to an 85-year, 75-year, 68-year, 20-year, 15-year and 10-year term of confinement under the respective counts, all to run concurrently, but each with a $10,000 fine. Appellant raises eight issues on appeal.

## II. SUFFICIENCY OF THE EVIDENCE

In her first five issues, Appellant challenges the legal sufficiency of the evidence to support the jury findings on counts one through five. In Issue One, Appellant challenges the aggregation of the losses for the five victims because the thefts alleged were not a part of a "single scheme or continuing course of conduct." Issues Two, Three, Four, and Five claim the evidence was legally insufficient to sustain a guilty finding for counts two through five. The gist of those complaints is that the aggregate sum the State claims for each victim must be reduced to account for money that went to Hill, or that was taken outside of the State of Texas. Based on the reductions for those reasons, Appellant claims the aggregate level of the theft drops below the statutory threshold for the crime charged.

### A. Standard of Review

Texas courts view legal sufficiency challenges under the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) and adopted in *Brooks v. State*, 323 S.W.3d 893 (Tex.Crim.App. 2010). Under that standard, we focus solely on whether the evidence, when viewed in the light most favorable to the verdict, would permit *any* rational jury to find the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19; *Brooks*, 323 S.W.3d at 902, n.19; *Davis v. State*, 488 S.W.3d 860, 863 (Tex.App.--Fort Worth 2016, no pet.).

6

Our system designates the jury as the sole arbiter of the credibility and the weight attached to the testimony of each witness. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex.Crim.App. 2020). Only the jury acts "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 319. In doing so, the jury may choose to believe or disbelieve that testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008). The jury remains at liberty to believe "all, some or none of a witness's testimony." *Metcalf*, 597 S.W.3d at 855. When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014); *see also Jackson*, 443 U.S. at 319.

We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson.*" *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). However, "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex.Crim.App. 1988) (en banc). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id.*, *citing Jackson*, 443 U.S. at 318. We will not overturn a verdict on sufficiency grounds "unless it is irrational or unsupported by proof beyond a reasonable doubt." *Ware v. State*, 62 S.W.3d 344, 349 (Tex.App.--Fort Worth 2001, pet. ref'd).

## B. The Aggregated Theft Charge

Appellant challenges the sufficiency of the evidence to aggregate the several victims' losses into a single sum as alleged in count one. She challenges the sufficiency of the evidence of

7

a common scheme, or ongoing course of conduct. Within this argument, she also challenges the State's ability to aggregate offenses where part of the conduct occurred outside the jurisdiction, or the money was paid to her common-law husband.

Texas law defines theft as the unlawful appropriation of property (including money) with the intent to deprive the owner of the property. TEX.PENAL CODE ANN. § 31.03(a). One appropriates property unlawfully by taking it without the owner's consent. *Id*. § 31.03(b). Effective consent cannot arise where it is induced by deception or coercion. *Id*. § 31.01(3)(A). Deception can arise by "creating a false impression or promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed." *Johnson v. State*, 187 S.W.3d 591, 602 (Tex.App.--Houston [14th Dist.] 2006, pet. ref'd); TEX.PENAL CODE ANN. §§ 31.01(1)(A), (E); 31.01(5). Similarly, no effective consent arises where the party has a mental disease, or who has diminished capacity because of age, where the actor knows of their inability to make reasonable property dispositions. *Id*. § 31.01(3)(C), (E).

The value of property taken determines the grade of the offense. *Id.* § 31.03(e) (setting out monetary levels for stolen property as to each grade of misdemeanor and felony). Texas law also permits a charging instrument to aggregate amounts obtained by theft "pursuant to one scheme or continuing course of conduct, whether from the same or several sources . . .." *Id*. § 31.09. Such "conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." *Id*. The culpable criminal behavior of Section 31.09 is the scheme or continuing course of conduct, as opposed to each individual theft used to prove the scheme. *Kent v. State*, 483 S.W.3d 557, 561 (Tex.Crim.App. 2016).

The legislature did not define the term "one scheme or continuing course of conduct" as used in Section 31.09 of the Penal Code. When interpreting a statute, we construe words and phrases according to the rules of grammar and common usage unless they have a technical or particular meaning. TEX.GOV'T CODE ANN. § 311.011(a); *Ex parte Ruthart*, 980 S.W.2d 469, 472 (Tex.Crim.App. 1998). So, without a technical definition provided by the statute, we give the phrase its common meaning and understanding. *Sendejo v. State*, 676 S.W.2d 454, 456 (Tex.App.--Fort Worth 1984, no pet.); *Lyon v. State*, No. 02-17-00195-CR, 2018 WL 6816209, at *7 (Tex.App.--Fort Worth Dec. 27, 2018, pet. ref'd) (mem. op., not designated for publication).

We find a reasonable jury could have found a common scheme or continuing course of conduct based on the evidence presented at trial. Through common threads of deceit concerning her marital status, romantic interest, health, and financial needs, Appellant convinced several senior citizens to transfer money or vehicles to her, or her common-law husband. While as to each victim, Appellant may have employed unique misrepresentations to gain that respective victim's trust, or to tug on particular heart strings, a reasonable jury could have found a common scheme. We note these similarities:

- Each victim was unmarried and aged 65 or older

- Appellant maintained the pretense of a romantic relationship with each victim

- Shortly after meeting, Appellant would request money from her victim

- Many of the reasons for needing money were the same: medical expenses, business expenses, lawyer fees, and living expenses

- Appellant misrepresented her marital and family status

Contrary to the implication of Appellant's argument, the specifics of each act of deception or method of obtaining the victim's money need not be identical. *Johnson*, 187 S.W.3d at 603-04 (affirming conviction for aggregated theft when the defendant gave each victim similar, yet

9

noticeably different, stories about why he needed large sums of money). Here they are similar enough that a reasonable jury could have found one scheme or course of conduct.

We acknowledge Appellant's reliance on the Fort Worth Court of Appeals decision in *Lyon*, 2018 WL 6816209, at *7.[1] There, the prosecution attempted to aggregate: (1) a series of bad checks for fertilizer products; (2) theft of services for transportation fees; and (3) investments in a clay target business. *Id*. at *1-2, *4-6. The court found that these counts were too disparate to aggregate, having nothing in common other than a failure to repay, which the court concluded was too tenuous a connection. *Id*. at *6-8. The court concluded that "the same means or method of appropriation were not used, the goods involved are not similar," and there was no link between two of the businesses from which the claimed thefts arose. 2018 WL 6816209, at *7.

Conversely, *Lyon* acknowledged several other cases where the evidence was held sufficient to show one scheme or a continuing course of conduct. *Agbeze v. State*, No. 01-13-00140-CR, 2014 WL 3738048 (Tex.App.--Houston [1st Dist.] 2014, pet. ref'd) (mem. op., not designated for publication) (fraudulent Medicaid reimbursement claims where defendant submitted to HHSC bills for multiple patients for products with the highest reimbursement rates whether the products were needed or requested); *Johnson*, 187 S.W.3d at 603 (continuing scheme found when individual obtained funds from seven different attorneys based on false story of needing representation due to injury on an oil rig). We could similarly add *De La Fuente v. State*, 264 S.W.3d 302 (Tex.App.--San Antonio 2008, pet. ref'd). In *De La Fuente* a contractor faced 25 separate homeowner complaints arising out of slipshod or incomplete remodeling projects over several years. The defendant used several different business entities, and the victims were all

---

[1] Appellant's case was transferred from our sister court in Fort Worth pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001. We follow the precedents of the Fort Worth Court to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

10

disparate as were the nature and value of the repair projects and the excuses given for the failure to perform the contracts. *Id*. at 306-314. Some victims received refunds, and others did not. *Id*. at 319. Nonetheless, the court found that these projects could be aggregated under the Texas theft statute. *Id*. at 318-319.

The facts of Appellant's case align more closely with *Agbeze*, *Johnson*, and *De La Fuente* than *Lyon*. Here, Appellant made a business out of disingenuous romantic relationships. It was apparently her only business, because neither she nor her common-law husband had any record of other gainful employment.[2] Thus, while the method of relieving complainants of their assets varied (credit card purchases, ATM withdrawals, gift of vehicles, real estate purchases), the common scheme or course of conduct lies in her using deception and the pretense of romantic relationships to appropriate property from her suitors. We find the record sufficient to support the jury's finding in this regard.

Appellant's next position is that the State cannot aggregate all the amounts because some of the transactions involve thefts that occurred entirely outside Texas. And indeed, portions of some of these transactions took place outside of Texas. Her best argument in this regard arises regarding Lois Cardin. Virtually every transaction with Cardin took place in Florida; they met there; Cardin unknowingly purchased a vehicle from a Florida dealership, and gave it to Appellant in Florida. However, the State presented evidence that Appellant misappropriated Cardin's credit card and made charges to her husband's auto business in Hurst, Texas. Thus, as part of the scheme involving Cardin, she transferred funds into the State of Texas, conferring jurisdiction here.

---

[2] The State forensic accountant presented evidence, however, that Appellant and her common-law husband spent substantial sums on real estate, gambling debts, and cosmetic surgery, all while telling her various victims that she was in desperate need for money.

We also adhere to the well-established principle that aggregation "creates one offense for purposes of severance, *jurisdiction*, punishment, limitations, and venue." *Kent*, 483 S.W.3d at 562 (emphasis added); *see also Graves v. State*, 795 S.W.2d 185, 187 (Tex.Crim.App. 1990) (en banc) (five-year felony statute of limitation, rather than the two-year misdemeanor statute of limitation, applied to a felony theft count based on aggregation of individual misdemeanor counts); *State v. Weaver*, 982 S.W.2d 892, 893 (Tex.Crim.App. 1998) (en banc) (proper county for venue was any county where "the individual thefts or any element thereof occurred."). And Texas law extends territorial jurisdiction where "either the conduct or a result that is an element of the offense occurs inside this state." TEX.PENAL CODE ANN. § 1.04(a)(1); *see also Rodriguez v. State*, 146 S.W.3D 674, 677 (Tex.Crim.App. 2004) (in a prosecution for aggravated kidnapping and capital murder, Texas had jurisdiction over the entire offense where the kidnapping took place in Texas even though the murder took place in Mexico). In an aggregated theft case involving a series of transactions, this Court previously applied that logic where either the appropriation or the intent to deprive occurred within the state. *Horan v. State*, No. 08-07-00222-CR, 2009 WL 2951918, at *3 (Tex.App.--El Paso Sept. 16, 2009, no pet.) (not designated for publication). Here, for each victim, either the deception or the appropriation occurred within the state, and we find the record sufficient to establish jurisdiction.

Appellant similarly cannot seek refuge in the fact that some of the transfers went to Hill, rather than to her. She argues such amounts should be deducted from the aggregate amounts of the theft because he is an unindicted co-conspirator. Initially, the argument fails because there was evidence in the record describing Hill as her common-law husband. Thus, through the marital estate she would have benefitted from the transfer. Second, appropriation under the theft statute does not require that one physically take possession of the funds. *State v. Fuller*, 480 S.W.3d 812,

820-21 (Tex.App.--Texarkana 2015, pet. ref'd) (appropriation occurred where bookkeeper transferred money from nursing home resident's trust fund to operating account although she did not pocket the funds). "[T]he crucial element of theft is the deprivation of property from the rightful owner, without the owner's consent, regardless of whether the defendant at that moment has taken possession of the property." *Stewart v. State*, 44 S.W.3d 582, 589 (Tex.Crim.App. 2001) (en banc). Finally, Appellant overlooks the testimony that transfers were made to Hill at her request and direction.

Another overarching problem with all of Appellant's complaints regarding count one is that even with her suggested deductions, she cannot show the remaining sums would still not exceed $300,000 in aggregated thefts. Stated otherwise, Appellant has failed to show some combination of her scheme or continuing course of conduct with fewer than all the victims, or fewer than all the sums shown by the State, could not meet the $300,000 threshold for count one.[3] We overrule Issue One.

### C. The Individual Theft Charges

In Issues Two through Five, Appellant challenges the theft counts attributable to the individual victims. For counts two to four, Appellant bases her challenge on the extra-territorial nature of some thefts to reduce the aggregate below the $200,000 or $150,000 amount alleged in those indictments. In a similar vein, Appellant attempts to shave from those totals, the amount that was sent to her common-law spouse. For the reasons discussed above, we reject those arguments and conclude that a reasonable jury could find sufficient evidence as to each victim to

---

[3] For instance, Appellant's brief calculates that the total stolen from James Olmstead in Texas was at most $190,405; for Paul Wilbur was at most $198,163.90; and for Danny Barnett was at most $289,602.80. Even taking Appellant's calculations at face value, a jury could have found more than $300,000 in thefts if it found any two of these victims were part of the same scheme or course of conduct, or some combination of the three. *See Kent v. State*, 483 S.W.3d 557, 561 (Tex.Crim.App. 2016) ("As long as the jury unanimously agrees that the proven thefts that comprise the elements of aggravated-theft exceed the threshold amount and the thefts are proven beyond a reasonable doubt, regardless of which transactions each juror believes to have occurred, the aggregated-theft is proved.").

exceed the aggregate amount alleged in the indictment. Moreover, the Texas Court of Criminal Appeals views Section 31.09 as creating "one offense for purposes of severance, jurisdiction, punishment, and limitations." *Weaver*, 982 S.W.2d at 894. The import of that view is that if the Texas trial court has jurisdiction over part of the aggregated theft claim, it has jurisdiction over the entire claim. *Id.* (so holding for venue claim where some thefts were in Harris County, and some outside the county). And under that view, Appellant has conceded that a significant portion of the thefts from James Olmstead ($190,405), Paul Wilbur ($198,163.90) and Danny Barnett ($289,602.80) occurred in Texas.

And in Issue Five, Appellant complains that there is no date certain for when Appellant obtained a vehicle from Douglas Wingo that was originally purchased from a Las Vegas dealership. The vehicle, purchased for $72,860 at a time when Wingo was cognitively impaired, was found at Appellant and Hill's home in Tarrant County, Texas. Appellant traveled in that same time-period between Texas and Nevada. From this evidence, a rational jury could conclude that Appellant unlawfully exercised control over the vehicle (an element of the offense) while she was in Texas.

We overrule Appellant's points of error one through five.

## III. DOUBLE JEOPARDY

In his sixth issue, Appellant claims that the State violated the prohibition against double jeopardy protection because the aggregated property thefts in count one (which lists six named victims) overlaps in part with the theft claims encompassed in counts two, four, and five.

### A. Applicable Law

"The double jeopardy provisions of the federal and Texas constitutions protect a citizen from repeated attempts at prosecution for the same criminal offense." *Ex parte Wheeler*, 203

14

S.W.3d 317, 322 (Tex.Crim.App. 2006). And in line with Appellant's claim, double jeopardy protects a defendant against multiple punishments for the "same offense." *Ex parte Cavazos*, 203 S.W.3d 333, 336 (Tex.Crim.App. 2006).

The legislature determines whether two or more offenses are the same for purposes of double jeopardy by defining the "allowable unit of prosecution." *Id*. at 336, *quoting Ex parte Hawkins*, 6 S.W.3d 554, 556 (Tex.Crim.App. 1999) (en banc). An allowable unit of prosecution is an offense defined by "a distinguishable discrete act that is a separate violation of the statute" in question. *Harris v. State*, 359 S.W.3d 625, 629 (Tex.Crim.App. 2011). Double jeopardy is not violated if the offenses can be distinguished from one another by discrete acts which are separate violations of the section and which, therefore, constitute separate units of prosecution. *Ex parte Benson*, 459 S.W.3d 67, 73 (Tex.Crim.App. 2015).

We review Appellant's double jeopardy claims under a de novo standard. *State v. Donaldson*, 557 S.W.3d 33, 39-40 (Tex.App.--Austin 2017, pet. ref'd).

**B. Preservation**

The State does not directly respond to Appellant's claim that the punishment for counts two, four, and five would reach the same conduct that she is punished for under count one. Instead, the State claims the complaint was not preserved because no objection was raised below.[4]

Generally, a "multiple punishments" double jeopardy claim may only be raised for the first time on appeal only where two conditions are met: (1) "the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record"; and (2) "when enforcement of the usual rules of procedural default serves no legitimate state interest." *Langs v. State*, 183 S.W.3d

---

[4] Appellant did not respond to the State claim of waiver when she filed her reply brief.

680, 687 (Tex.Crim.App. 2006). The *Langs* court relied upon the principles set forth in *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex.Crim.App. 2000) (en banc).

We agree with the State that neither of the two conditions are met on this record. Superficially, the theft in count one shares common victims to the thefts in counts two, four, and five. Yet the case involves hundreds of transactions from 40-50 accounts involving six different complainants. The jury could have used certain transactions in convicting Appellant on the combined charge (count one) and other transactions on the counts involving the separate complainants (counts two to five). While that presents a complicated result, it raises the first problem with the Appellant's double jeopardy claim: the undisputed facts here do not necessarily show multiple convictions for the same conduct which appear clearly on the face of the record.

Second, we cannot say that the enforcement of our regular rules of procedural default would serve no legitimate state interest. *Langs*, 183 S.W.2d. at 687. Here, as in *Gonzalez*, a timely objection "would have provided the trial court and the prosecution an opportunity to remove the basis of the objection[.]" *Gonzalez*, 8 S.W.3d at 646. As the *Gonzalez* court noted:

> The State has a valid interest in avoiding problems which would interfere with its lawful prosecution of alleged crimes and in being able to research and prepare responses to claims of double jeopardy. It also has a valid interest in being able to investigate and present any evidence which might exist that supports or controverts claims of double jeopardy in order that prosecutions continue when it is proper to do so. It has a valid interest in conserving valuable judicial time by not going through unnecessary trials when a double jeopardy claim is valid.

*Id. quoting Casey v. State*, 828 S.W.2d 214, 218 (Tex.App.--Amarillo 1992, no pet.). Based upon this record, we cannot say that Appellant preserved error in her claimed double jeopardy violation. For that reason, we overrule her sixth point of error.

## IV. SUPPRESSION OF THE EMAIL EVIDENCE

### A. The Search Warrant for Appellant's Email Account

Appellant's seventh issue claims that her email account was illegally searched. The State obtained a search warrant that ordered Yahoo!, Inc. to provide electronic customer data regarding Appellant's email address, and that for Hill's auto-body business. The warrant required Yahoo to turn over (1) user/subscriber information of the employee assigned to the listed email addresses; (2) dates of use for the email addresses; (3) the content of incoming and outgoing emails whether stored in deleted items, sent items, inbox, outbox, or drafts; (4) full headers including destination and recipient and sender information; and (5) any stored content. During trial, Appellant asked the trial court to suppress any information gleaned by the warrant because it violates the particularity requirement of the Fourth Amendment. The trial court overruled that objection and admitted the evidence.

### B. Governing Law and Standard of Review

The Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized.*" U.S. CONST., amend. IV (emphasis added).[5] The Fourth Amendment's particularity requirement "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh v. Ramirez*, 540 U.S. 551, 561 (2004); *see also Bonds v. State*, 403 S.W.3d 867, 874-75 (Tex.Crim.App. 2013) (describing additional rationales, to include "ensuring that the officer searches the right place, . . . limiting the officer's discretion and narrowing the scope of his

---

[5] Appellant notes that the courts have found a right of privacy with respect to emails, *citing U.S. v. Warshak,* 631 F.3d 266, 274 (6th Cir. 2010). Unlike this case, however, *Warshak* involved a warrantless search, but we assume for the purposes of this appeal that Appellant had some expectation of privacy in her and her common-law husband's emails.

search" and "minimizing the danger of mistakenly searching the person or property of an innocent bystander or property owner").

We review Appellant's challenge to the denial of her motion to suppress evidence under the standard set forth in *Sims v. State*, 569 S.W.3d 634, 640 (Tex.Crim.App. 2019) and *Guzman v. State*, 955 S.W.2d 85, 87-91 (Tex.Crim.App. 1997) (en banc). The trial court's findings of historical fact and those determinations of mixed law and fact that turn on observations of demeanor and credibility receive almost total deference when supported in the record. *Sims*, 569 S.W.3d at 640. As to pure issues of law, or mixed questions of law and fact that do not involve credibility, we review those de novo. *Id*. When the trial court does not file any findings of fact, as here, we review the evidence in the light most favorable to the trial court's ruling. *Torres v. State*, 182 S.W.3d 899, 902 (Tex.Crim.App. 2005) (en banc). "The trial court's ruling will be sustained if it is correct on any applicable theory of law and the record reasonably supports it." *State v. Arellano*, 600 S.W.3d 53, 57-58 (Tex.Crim.App. 2020).

**C. Application**

Appellant does not challenge here that the magistrate had probable cause to suspect Appellant's email account was being used for nefarious purposes. The only question is the scope of the warrant. The degree of specificity required by the Fourth Amendment is flexible and varies depending upon the crime involved and the types of items sought. *U.S. v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011); *see also Aleman v. State*, No. 13-16-00509-CR, 2018 WL 4016938, at *3 (Tex.App.--Corpus Christi Aug. 23, 2018, no pet.) (mem. op., not designated for publication). "[T]he Fourth Amendment does not require perfection in the warrant's description of the place to be searched." *Bonds*, 403 S.W.3d at 873. It does prohibit "general warrants authorizing officials

18

to rummage through a person's possessions looking for any evidence of a crime." *United States v. Layne*, 43 F.3d 127, 132 (5th Cir. 1995).

We conclude that the nature and far reach of the charged crimes justifies the scope of the warrant. The thefts were alleged to have occurred over a six-year period. They involved six different individuals. They also involved two purported businesses which the victims were led to believe they were investing in or assisting. The scheme at issue involved multiple transactions with each victim, and the amounts involved exceeded one million dollars. The supporting affidavit for the warrant states that Appellant provided the Yahoo email address to the victims, such that it might contain records of payments and purchases made by them. The warrant and it's supporting affidavit set forth facts supporting the conclusion: (1) that a specific offense or offenses had been committed, (2) that the item to be searched constituted or contained evidence of the offense or evidence that a particular person committed the offense; and (3) that the evidence sought was located within the thing or place to be searched. *See Aleman*, 2018 WL 4016938, at *4 (finding description of "electronic media" sufficient when authorities knew the suspect had some type of recording device but knew little else about it). Given the standard of review and the deference afforded the trial court's implied findings, we affirm the trial court's determination on the warrant and overrule Issue Seven.

## V. SUBPOENA OF THIRD-PARTY RECORDS

Appellant objected to the introduction of several third-party records obtained through a grand jury subpoena. The records in question include those kept by several financial institutions, as well as records from various casinos where Appellant gambled with money appropriated from the complainants. The essence of Appellant's complaint is that the records were obtained through a subpoena without first securing a search warrant.

19

Appellant concedes that the State's use of a subpoena is supported by the court's decision in *United States v. Miller*, 425 U.S. 435 (1976). Under *Miller* and the "third-party" doctrine, a person has no legitimate expectation of privacy in information voluntarily turned over to third parties. *Id.* at 440 (one has no expectation of privacy in one's bank records because they are the business records of the bank rather than the account holder). Appellant contends that more recent cases have called *Miller* into question. *See e.g.*, *Holder v. State*, 595 S.W.3d 691, 704 (Tex.Crim.App. 2020) (holding that the *Miller* third-party doctrine alone cannot defeat a person's expectation of privacy in at least 23 days of historical cell tower location data); *Carpenter v. U.S.*, 138 S.Ct. 2206, 2263 (2018) (Gorsuch, J., dissenting) ("People often *do* reasonably expect that information they entrust to third parties, especially information subject to confidentiality agreements, will be kept private.").

As an intermediate state appellate court, we lack any authority to reject *Miller* or unilaterally reject the third-party doctrine. Appellant acknowledges this reality and candidly admits that she raises the point to preserve error in the event some future court overrules the *Miller* decision. ). We therefore overrule Appellant's eighth point of error.

## IV. CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.

JEFF ALLEY, Chief Justice

September 11, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

20